**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01450-RBJ

ORP SURGICAL, LLC, et al.,                      Plaintiffs/Counter-Defendants,

v.

HOWMEDICA OSTEONICS CORP.,            Defendant/Counter-Plaintiff.

---

**DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

---

Defendant Howmedica Osteonics Corp. ("Stryker") hereby moves for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) as follows[1]:

## INTRODUCTION

In their case-in-chief, Plaintiffs ORP Surgical, LLC and Mr. Petrides (collectively, "ORP") claimed damages under four theories but, as to each, ORP presented a damages analysis that was unsupported, overstated, and contradicted by the record. That, as a matter of law, precludes the Court from awarding damages with the requisite reasonable certainty. Under Fed. R. Civ. P. 52(c), the Court should rule that ORP has failed to prove damages and thus failed to prove its claims.

## LEGAL STANDARDS

In a bench trial, once "a party has been fully heard on an issue," if the Court "finds against the party on that issue, the Court "may enter judgment against the party on a claim ... that, under the controlling law, can be maintained ... only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). Under Rule 52(c), the Court does *not* view the evidence in the light most favorable to the nonmoving party. *Jones v. Est. of Cole*, 483 F. App'x 468, 472 n.4 (10th Cir. 2012). Instead, the Court exercises its role as factfinder, weighing the evidence, resolving disputed issues of fact, and

---

[1] Counsel for Stryker conferred with counsel for Plaintiffs, and Plaintiffs oppose this motion.

"decid[ing] for itself in which party's favor the preponderance of the evidence lies." *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1292 (D. Colo. 2013) (quotation omitted).

ORP proceeded to trial on two claims: breach of contract under New Jersey law and "corporate raiding" under Colorado law. To prevail on its contract claim, ORP had to show that Stryker's "breach, or failure to do what the contract required, caused a loss" to ORP. N.J. CV JI 4.10A. ORP bore the burden of proving its damages with sufficient certainty to "enable the trier of facts to make a fair and reasonable estimate." *Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC*, 921 A.2d 1100, 1108 (N.J. 2007) (quotation omitted). ORP cannot recover damages where the damages "sought are too remote, speculative, contingent and fanciful to be considered." *Kurtz v. Oremland*, 111 A.2d 100, 106 (N.J. Super. Ct. Ch. Div. 1954).

As for ORP's "corporate raiding" claim, because Colorado law recognizes no such cause of action, there is no governing legal standard. But, as a general matter, Colorado law comports with New Jersey law on the need for reasonable certainty for an award of damages. *See, e.g.*, *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993).

## ARGUMENT

During ORP's case-in-chief, it sought damages based on three alternative (*i.e.*, not additive) damages theories: (I) the amount Mr. Petrides demanded for the right to terminate the Trauma Sales Representative Agreement (the "TSRA") and the right to hire certain ORP sales representatives (the "Sales Reps"), (II) ORP's future lost profits, and (III) disgorgement of Stryker's profits.[2] ORP additionally sought damages based on certain restriction payments. But ORP failed to establish entitlement to damages under any of these theories.

---

[2] ORP's two claims and various damages theories complain of the same alleged wrongdoing and harm, so recovery under both claims or multiple theories would violate Colorado's rule against double recovery. *Lexton-Ancira Real Est. Fund, 1972 v. Heller*, 826 P.2d 819, 823 (Colo. 1992).

## I.      Mr. Petrides' prior demand is not a measure of ORP's damages.

ORP first seeks to recover damages based on the amount Mr. Petrides demanded for the right to terminate the TSRA and hire 19 Sales Reps, deeming this "a fair market valuation." (Expert Report of Elaine E.L. White ("White Report") at 6.) But this damages theory (A) is not a measure of ORP's actual losses, and (B) seeks damages ORP is not entitled to.

### A.      Mr. Petrides' demand is not evidence of ORP's alleged actual loss.

ORP's fair-market-value damages theory fundamentally misapprehends the measure of damages for a breach of contract. Under New Jersey law, a non-breaching party "who suffers an ascertainable loss" can recover damages "as measured by … the loss in the value" caused by the breach. *D'Agostino v. Maldonado*, 78 A.3d 527, 541 (N.J. 2013) (quotation omitted). ORP's damages theory ignores that fundamental principle by shifting the focus to the value *to Stryker* for the right to terminate the TSRA and hire 19 Sales Reps, rather than the actual loss of value suffered *by ORP* as a result of Stryker's alleged breach.

In effect, ORP acts as if Stryker deprived ORP of the benefit of the bargain for a contract for some good or property, for which ORP is entitled to recover fair market value. But there was no such contract and Mr. Petrides' unnegotiated demand was not a fair market valuation. Further, ORP's actual loss has no connection to the amount Mr. Petrides demanded. Compensatory damages are designed "to place the injured party in as good a monetary position as [it] would have enjoyed if the contract had been performed as promised," N.J. CV JI 8.45, and here, ORP would not have received the amount demanded but for Stryker's alleged breach. In other words, by seeking to recover the amount Mr. Petrides demanded, ORP wants the Court to enforce a contract the parties never agreed to, based on an underlying contract ORP voluntarily and unilaterally terminated. But that is not how New Jersey law measures breach-of-contract damages.

**B.      Stryker's actions caused ORP no actual loss under this theory.**

ORP also cannot recover damages based on Mr. Petrides' demand because Mr. Petrides terminated the TSRA and eliminated ORP's trauma business. After that, the discussed "right to terminate" the TSRA no longer existed and had no value to ORP or Stryker. Because ORP caused its own alleged loss, it cannot recover any damages associated with that loss, which ORP identified as $8 million.[3] *See, e.g.*, *Totaro*, 921 A.2d at 1108 ("[T]o be compensable, 'the loss must be a reasonably certain consequence of the breach ….'" (quotation omitted)).

Moreover, any damages associated with the TSRA termination and the alleged loss of the Sales Reps is unsupported, unreliable, and speculative, relying on the false and unproven assumption that the Sales Reps would have stayed at ORP even after Mr. Petrides terminated the TSRA. ORP failed to present any evidence to justify that assumption and, to the contrary, it is more likely than not the Sales Reps would have left ORP regardless of any action by Stryker.

To start, the Sales Reps had no legal obligation to stay. They were independent contractors, with the right to terminate their Independent Contractor Agreements ("ICAs") with ORP upon written notice. And although each ICA contained a covenant not to compete, that covenant, by its own terms, applied only "following termination … **by the Company**." (DE 159 at 12 (emphasis added).) Because ORP's own expert admits the Sales Reps all resigned and left ORP on their own accord, (White Report at 8), rather than "following termination ... **by the Company**," the non-compete covenants never took effect and would not have hindered the Sales Reps.

Further, regardless of whether the covenants not to compete were ever triggered, they would not have impacted the Sales Reps' employment decisions because they are unenforceable

---

[3] Although a one-year non-solicitation period followed termination, ORP's expert did not assess whether that covenant had independent value. Absent such evidence, determining a value for that covenant post-TSRA-termination would be pure speculation, and ORP failed to prove entitlement to any damages related to the covenant.

under governing Colorado law. Colorado deems such covenants void unless they fit within certain, enumerated exceptions. C.R.S. § 8-2-113(2). Although the ICAs purport to fit within the exception for "the protection of trade secrets," *id.* § 8-2-113(2)(b), that exception does not permit a general prohibition against competition where an employer is adequately protected by a narrower clause prohibiting disclosure of trade secrets. *Colo. Acct. Machs., Inc. v. Mergenthaler*, 609 P.2d 1125, 1126 (Colo. App. 1980). Here, the ICAs include both a specific provision prohibiting disclosure of trade secrets and a sweeping provision prohibiting any form of competition, with no mention of or nexus to the protection of trade secrets. Because "the sole purpose behind the restrictive covenant is to prohibit all competition," it is void and unenforceable against the Sales Reps. *Id.*

And, even if the trade-secrets exception did apply, ORP did not present evidence sufficient to establish that its allegedly confidential information qualifies as a trade secret or that the Sales Reps disclosed any such information after leaving ORP. *See, e.g.*, *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984) (rejecting existence of a trade secret where "there was almost no evidence favorable to employer regarding the … factors which are usually considered by a court in determining whether a 'trade secret' actually exists as the subject of a non-competition clause"). Accordingly, ORP failed to establish any legal barrier to the Sales Reps leaving ORP.

That further precludes recovery based on ORP's demand because that theory necessarily assumes the Sales Reps would have stayed at ORP but for Stryker's alleged conduct. But ORP failed to prove that premise. In fact, the Sales Reps would *not* have stayed at ORP after Mr. Petrides terminated the TSRA. That termination deprived the Sales Reps of their primary source of income. Logically, it is unlikely the Sales Reps would have stayed at ORP after Mr. Petrides cut off their ability to sell Stryker products (or any competing products for one year) and thus make sufficient income to support their families, during the pandemic. In fact, the evidence elicited during ORP's

case-in-chief showed the Sales Reps' anxieties about the loss of the ability to sell Stryker products and the impact it would have on their ability to support themselves and their families. The Sales Reps' resignations letters specifically identified ORP's termination of the TSRA as the reason for their resignations. ORP thus did not establish that the Sales Reps had *any* reason to stay at ORP following the TSRA termination, much less that it is likely that they actually would have stayed.

In any event, Mr. Petrides' buyout demand does not constitute a fair market valuation of the right to hire the Sales Reps. ORP's expert relied on the second draft termination agreement, but there, the amounts associated with the Sales Reps were for 19 reps and included not just the right to hire them, but also a 3-year non-compete agreement and other consideration Stryker never received. More importantly, Mr. Petrides *rejected* that proposal, refusing to agree on a value for the Sales Reps and demanding instead a $13.6 million price term that encompassed only the TSRA termination and a 30-day "Solicitation Period" in which Stryker could attempt to solicit and hire ORP's reps, without identifying or valuing the Sales Reps independently. Of course, neither draft was ever accepted and the discussed deal never happened, so it makes no sense to award damages based on an alleged "fair market value" that encompassed shifting and conflicting terms on which there was never a meeting of the minds.

Finally, Mr. Petrides' buyout demand does not accurately measure ORP's actual damages because ORP's expert conceded the "valuation of these rights was determined" pre-COVID-19 and ORP's alleged damages were "lower due to the impacts of COVID-19." (White Report at 8 n.8.) ORP thus admits that Mr. Petrides' demand is not an accurate or reliable reflection of its actual alleged loss. The Court cannot award damages based on ORP's speculation as to its loss "[i]f the impacts of COVID-19 were removed," (*id.*). *See, e.g.*, *Kurtz*, 111 A.2d at 106 (plaintiff cannot recover damages that are too "speculative, contingent and fanciful to be considered").

## II.   ORP's claimed lost profits are too speculative and flawed to be awarded.

Next, ORP sought damages in the form of future lost profits. Future lost profits are recoverable only if they "meet the legal standard of reasonable certainty." *Weiss v. Revenue Bldg. & Loan Ass'n*, 182 A. 891, 893 (N.J. 1936). Such "[d]amages sustained by a business must relate to loss of net profits; they may not be speculative, remote, imaginary, or impossible of ascertainment." *Wasserman's, Inc. v. Twp. of Middletown*, 645 A.2d 100, 109 (N.J. 1994) (quotation omitted). Here, ORP's expert failed to establish with any degree of reasonable certainty that ORP suffered an ascertainable, non-speculative loss of profits.

As explained above, ORP failed to establish entitlement to *any* damages for the loss of the Sales Reps because it failed to establish causation—*i.e.*, that the Sales Reps would have stayed at ORP after ORP terminated the TSRA but for Stryker's alleged conduct. ORP also failed to prove that had the Sales Reps stayed, they would have been able to replicate their prior sales of Stryker products by selling products they had limited or no experience selling and despite being prohibited from selling any competitive products for one year after ORP terminated the TSRA. ORP failed to establish lost profits due to the loss of the Sales Reps with any reasonable degree of certainty.

ORP's effort to recover lost profits also fails because ORP's expert's calculations were flawed at every step of the analysis. *First*, ORP's expert purported to determine ORP's historical net income by reference to ORP's 2015-2018 income statements. But that includes income from the sale of **Stryker products** ORP lost the right to sell after Mr. Petrides terminated the TSRA, and ORP made no effort to differentiate between income from ORP's sale of Stryker products versus non-Stryker products. ORP cannot recover lost profits related to Stryker products because it voluntarily gave up the right to sell them and, consequently, it cannot base its future lost profits claim on the historical sales income from products it gave up the right to sell.

*Second*, ORP's expert purported to project ORP's future growth rate. To do so, ORP's

expert took ORP's 2005-2018 compound annual revenue growth rate, then assumed the same rate would apply until 2026, based solely on Mr. Petrides' unverified representations regarding "sales quotas," "internal growth targets," and that "the outlook for future sales was positive given the market and ORP's continued growth." (White Report at 8-9.) But as with ORP's historical sales income data, ORP's historical revenue growth rate was based on sales of Stryker products ORP gave up the right to sell. It is beyond speculative to assume ORP's future annual growth rate will mirror its historical rate when ORP cannot sell Stryker products—the same products its Sales Reps relied upon for so long—and absent a track record to support lost profits based on sales of non-Stryker products. It was also speculative to assume ORP's growth rate would be unaffected by the pandemic for years, despite COVID-19's impact on product sales for elective surgeries.

*Third*, ORP's expert purported to project what ORP's net income would have been from 2019 to 2026 but for Stryker's alleged conduct, improperly using ORP's overstated *revenue* growth rate as a proxy for an assumed future *profits* growth rate. ORP's expert also admitted this "projection" was wholly based on the assumption that "ORP would have been able to substantially or completely replace lost income from the termination of the Trauma SRA with income from new contracts with medical device manufacturers." (*Id.* at 9-10.) ORP failed to present *any* evidence to support that assumption, and there is no basis to assume ORP could have transitioned to new product lines and immediately made the same profits it made selling Stryker products. New Jersey law precludes an award of future lost profits that are contingent on the plaintiff obtaining new business or new customers. *See, e.g.*, *Weiss*, 182 A. at 893 (future lost profits based on "probable earning capacity" anticipated from hoped-for collateral engagements too "remote, speculative and problematical" to be awarded); *Seaman v. U.S. Steel Corp.*, 400 A.2d 90, 94 (N.J. Super. Ct. App. Div. 1979) (future lost profits based on "a new operation in [the plaintiff's] business" not

recoverable). Nor did ORP's expert consider ORP's inability to sell products that compete with Stryker products for one year post-TSRA-termination, further limiting its future sales.

Additionally, ORP's eight-year loss period has no basis, because the parties' agreements provided for only a one-year non-solicitation period, the TSRA terminated on its own terms as of December 31, 2020, and ORP did not prove it would have been renewed. *See Kurnik v. Cooper Health Sys.*, 2008 N.J. Super. Unpub. LEXIS 2267, at *52 (N.J. Super. Ct. App. Div. July 24, 2008) (rejecting damages claim based on assumption of contract renewal). It is undisputed Stryker could have solicited and hired the Sales Reps after that one-year period, so ORP's alleged damages are logically constrained to the same time period. In other words, if Stryker had solicited the Sales Reps one day before the one-year period ended, ORP would have, at most, one day's worth of damages, not eight years' worth. Any damages after the one-year period are not recoverable because ORP did not prove the TSRA would have been renewed (the evidence shows renewal was improbable) or that the Sales Reps would have stayed at ORP after that period ended.

Moreover, ORP's projections are inherently speculative to the extent they claim damages for the sale of unidentified replacement products five years into the future. ORP's expert utilized that time period based solely on Mr. Petrides' assertion it would take ORP that long to replace the Sales Reps, but ORP failed to prove that speculative assertion. Instead, ORP's expert simply assumes a permanent loss to ORP and projects an amount of future sales over a five-year period, with no existing contracts or relevant historical data to support those assumptions, resulting in a projected but-for income three times ORP's maximum actual historical net cash flow. And, in any event, as explained above, ORP cannot prove any damages caused by the Sales Reps' departures because it failed to show they would have remained with ORP but for Stryker's alleged conduct (let alone that they would have stayed until 2026). ORP experienced a normal yearly attrition rate

of more reps than left and joined Stryker. Thus, ORP replaces reps every year, and it did not show the Sales Reps could not have been easily and quickly replaced like any other reps.

*Fourth*, ORP's expert purported to project ORP's actual net income for the same 2019-2026 period. But in doing so, ORP's expert assumed ORP would only continue to sell its remaining product base (which was primarily Acumed) moving forward, contrary to the prior assumption (for purposes of calculating future lost profits but for Stryker's alleged conduct) that ORP would have replaced its lost income with income from new contracts with new manufacturers. In other words, ORP artificially *inflated* what it would have made but for Stryker's alleged conduct by assuming it would have completely replaced all income from Stryker products sales, while artificially *decreasing* its projected actual future profits by assuming it would not replace *any* income from the sales of Stryker products. ORP's expert provided no rational explanation for the shifting assumptions underlying this analysis.[4]

*Finally*, ORP's expert purported to quantify ORP's lost profits by calculating the difference between the two projected net incomes (projected but-for net income minus projected actual net income), then discounting that amount to present value. But, as explained above, this analysis relied on a faulty historical income amount, a flawed annual growth rate, an artificially inflated projected but-for net income, an artificially decreased projected actual net income, and an unsupported and speculative damages period. In light of these flaws, ORP's future lost profits claim is not recoverable under New Jersey law—"garbage in, garbage out." *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, 2021 U.S. Dist. LEXIS 218816, at *18 (D. Colo. Nov. 12, 2021).

## III.   ORP is not entitled to disgorgement of Stryker's profits.

Under its next alternative damages theory, ORP asserts entitlement to the equitable remedy

---

[4] ORP's expert also failed to account for the increased actual income ORP received in the form of Payment Protection Program relief during the pandemic.

of disgorgement of Stryker's net profits from sales made by the former ORP Sales Reps. But ORP is not entitled to recover any damages under this theory, because (A) disgorgement is an equitable remedy no longer available to ORP, and (B) ORP's disgorgement analysis is inherently flawed.

**A.      Disgorgement is not a viable remedy for ORP's remaining claims.**

ORP's disgorgement theory is based on ORP's unjust enrichment claim, asserting that disgorgement of Stryker's profits from sales made by the Sales Reps is proper because "such sales appear to depend either directly upon ORP's sales representatives or the resources they provided to Stryker." (White Report at 12-13.) Disgorgement is an equitable remedy for unjust enrichment. *See, e.g.*, *Am. Cyanamid Co. v. Sterling Drug, Inc.*, 649 F. Supp. 784, 787 (D.N.J. 1986) ("[D]isgorgement of unjust enrichment is an equitable remedy …." (quotation omitted)); *Swift v. Pandey*, 2013 U.S. Dist. LEXIS 162029, at *29 (D.N.J. Nov. 13, 2013) ("[D]isgorgement is an equitable remedy … subsumed within Plaintiff's claims of unjust enrichment." (emphasis omitted)). Yet shortly before trial, ORP dismissed its unjust enrichment claim (and other claims), leaving only its claims for breach of contract and "corporate raiding." (DE 287.)

ORP's dismissal of its unjust enrichment claim precludes its attempt to obtain disgorgement. *See, e.g.*, *Barr & Sons, Inc. v. Cherry Hill Ctr., Inc.*, 217 A.2d 631, 640 (N.J. Super. Ct. App. Div. 1966) ("Compensatory damages for breach of an agreement … are measured by the 'loss' sustained by the plaintiffs … and not by the profits made by the violator."); *see also Kansas v. Nebraska*, 574 U.S. 445, 482 (2015) (Thomas, J., concurring in part and dissenting in part) ("The usual remedy for breach of a contract is damages based on the injured party's actual loss caused by the breach. Disgorgement, by contrast, is an extraordinary remedy that goes beyond a plaintiff[']s damages, requiring the breaching party to refund additional profits gained in the breach. In American law, disgorgement of profits is not generally an available remedy for breach of contract." (citations omitted)). ORP argues disgorgement is an available remedy for breach of

contract, but it relies on (1) New Jersey cases that say no such thing,[5] and (2) Colorado cases that do not apply because the parties' contracts are governed by New Jersey law. (*See* DE 305 at 6-7.)

Rather than Stryker's profits, the measure of ORP's alleged damages would be the actual losses, if any, ORP suffered as a result of Stryker's alleged conduct. "Profits made by a defendant are not the measure of a plaintiff's damage unless plaintiff would have secured them in absence of the [breach]." *Barr & Sons*, 217 A.2d at 640. Here, ORP would not have secured Stryker's profits but for Stryker's alleged conduct, because Stryker's profits are based on the sale of Stryker products that ORP lost the right to sell when it terminated the TSRA. Further, there is no evidence the Sales Reps would have stayed with ORP but for Stryker's alleged conduct.[6] Accordingly, "[t]o compel [Stryker] to disgorge these profits could give [ORP] a windfall and penalize [Stryker], neither of which serves the purpose of contract damages." *Fishkin v. Susquehanna Partners, G.P.*, 340 F. App'x 110, 116 (3d Cir. 2009) (quotation omitted).

### B.     ORP's disgorgement analysis is inherently flawed.

Further, ORP's disgorgement analysis, like the rest of its damages analysis, suffers numerous flaws that necessarily preclude the Court from awarding such damages. ORP failed to establish entitlement to any disgorgement at all, let alone a non-speculative and reasonably ascertainable amount of disgorgement.

To start, ORP's disgorgement theory claims ORP is entitled to recover Stryker's profits from the sale of Stryker's products. That makes no sense, because once Mr. Petrides terminated the TSRA, ORP had no right to sell Stryker products (or competing products for one year) or earn

---

[5] Of the three cases ORP relies upon, one deals with rescission, not disgorgement (*Miller*); another says only that disgorgement is an equitable remedy for unjust enrichment (*Johnson*); and the third involves a breach of the duty of loyalty, not a breach of contract (*Kaye*). (DE 305 at 6-7.)

[6] That ORP's disgorgement theory is untethered from its actual alleged losses is further proven by the fact that each of the three theories is alternative, not additive, but ORP seeks to recover twice as much in disgorgement of Stryker's profits as it does for its claim for its own lost profits.

commissions on them. Because ORP had no right to profit off the sale of those products and could never have made those sales or earned those commissions following termination of the TSRA, regardless of whether Stryker solicited the Sales Reps, it can have no right to disgorgement based on the sale of those products. In contrast, Stryker had every right to sell its own products, and it always had the right to sell its products in the same territories ORP previously occupied.

Additionally, ORP cannot establish any connection between Stryker's alleged conduct and its subsequent sales of its own products. Even if the Sales Reps had not joined Stryker, Stryker already had and would have hired other direct sales reps to cover those same hospitals, surgery centers, and physicians once ORP terminated the TSRA. ORP did not even try to determine the amount of sales Stryker would have made without the former ORP Sales Reps, so it failed to establish whether Stryker obtained any profit *as a result of* its alleged solicitation of the Sales Reps that it would not have obtained but for that conduct. In other words, to say that ORP is entitled to disgorgement of *all* of Stryker's profits is to say that Stryker would have made *no* sales but for its alleged solicitation of the Sales Reps. That, of course, is absurd—Stryker had numerous Sales Reps who could sell both trauma and joint replacement products, excluding the 14 former ORP reps. Accordingly, ORP did not meet its burden of proving an ascertainable amount of Stryker's alleged unjust enrichment.

Finally, ORP's expert grossly miscalculated the measure of disgorgement. ORP sought disgorgement of $22,862,976 (as amended) in Stryker's profits, reaching that number by adding up all sales attributable to James Demorest and the entire trauma sales force at Summit Surgical over a given time period, then reducing that number to account for certain expenses. ORP thus demands *all* net profits Stryker obtained from these sales, but there is no basis for such total disgorgement. As addressed above, ORP is not entitled to disgorgement of profits from the sale of

Stryker products because ORP gave up the right to sell those products when it terminated the TSRA, nor can it conceivably disgorge profits from sales by reps other than ORP's former 14. ORP thus seeks to disgorge profits that ORP could not possibly have obtained regardless of Stryker's alleged conduct. Nor are they profits that Stryker would not have obtained but for allegedly wrongful conduct: even had the Sales Reps stayed at ORP after it terminated the TSRA, Stryker would have relied on its existing sales reps and hired other reps to sell its products, and ORP would not have been entitled to any of the profits.

Further, ORP's expert mistakenly attributed all trauma product sales by Summit Surgical to the 14 Sales Reps, thus claiming all such sales should be disgorged. But ORP's expert acknowledged that although the Summit Surgical sales include sales by Stryker's numerous pre-existing or separately hired trauma reps, ORP did not segregate or exclude those sales. Additionally, ORP's expert improperly included sales for Mr. Demorest until April 2021, but he only sold products under the Joint Replacement SRA, which terminated on March 31, 2019 and had a non-solicitation clause that expired on March 31, 2020. Because Stryker would have been free to hire Mr. Demorest after that date, any subsequent sales attributable to him are irrelevant.

Ultimately, ORP seeks a windfall by seeking disgorgement of *all* Stryker's profits. When ORP sold Stryker's products, it earned a 17% commission on sales, and Stryker received the remaining revenue. (White Report at 11.) Disgorgement of all Stryker's profits would result in an impermissible windfall for ORP. *See, e.g.*, *Granelli v. Chi. Title Ins. Co.*, 2012 U.S. Dist. LEXIS 80019, at *33 (D.N.J. June 8, 2012) (denying equitable relief as a breach-of-contract remedy where "[s]uch a judgment would be unduly duplicative and lead to a windfall judgment"). But, because ORP gave up the right to sell Stryker products at all, and because Stryker would have likely made these sales whether or not it hired the Sales Reps, ORP would not be entitled to any disgorgement

even had it not abandoned its disgorgement theory by dismissing its unjust enrichment claim.[7]

## IV. ORP failed to establish entitlement to restriction payments.

Finally, ORP sought to recover certain restriction payments described in the TSRA and the Joint Reconstruction SRA (collectively, the "SRAs"). But ORP failed to prove entitlement to those payments under the plain language of the SRAs, each of which provides that ORP "shall not be entitled to any Restriction Payments if [ORP]: (i) breached their duty of loyalty to [Stryker]; (ii) breaches any terms or conditions of this Agreement; (iii) is terminated for 'Cause;' or, (iv) otherwise acted in bad faith or contrary to law or regulation." In ORP's case-in-chief, it failed to establish that the Joint Reconstruction SRA was not terminated for cause and that ORP had not breached the SRAs. Thus, ORP is not entitled to restriction payments.

## <u>CONCLUSION</u>

For the foregoing reasons, Stryker respectfully requests that the Court enter judgment in favor of Stryker on each of ORP's claims.

Date: December 16, 2021

Respectfully submitted,

HOLLAND & HART LLP
*s/ Maureen R. Witt*
Maureen R. Witt (mwitt@hollandhart.com)
555 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000

SEYFARTH SHAW LLP
*s/ Michael D. Wexler*
Michael D. Wexler (mwexler@seyfarth.com)
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606
Telephone: (312) 460-5000

*Attorneys for Defendant/Counter-Plaintiff Howmedica Osteonics Corp.*

### CERTIFICATE OF SERVICE

I certify that on December 16, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

*s/*_____

---

[7] ORP also failed to show that disgorgement is an available remedy for "corporate raiding," because that is not a viable claim under Colorado law, and Colorado law parallels New Jersey's requirements as to causation and reasonable certainty as to damages.