IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01450-RBJ

ORP SURGICAL, LLP, a Colorado limited liability company, and
LEE PETRIDES,

      Plaintiffs,

v.

HOWMEDICA OSTEONICS CORP, a New Jersey corporation,

      Defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT

---

      This case was tried to the Court beginning December 13, 2021 to December 17, 2021. After a COVID-imposed hiatus, the case concluded on March 1, 2, and 4, 2022. Plaintiffs ORP Surgical, LLP (ORP) and its primary owner, Lee Petrides, brought suit against Howmedica Osteonics Corp., a subsidiary of Stryker Corp., for alleged wrongful actions done during the winding down of business relations between the two companies. Defendant, which I will refer to as "Stryker," brought counterclaims against ORP and Mr. Petrides.

### I.    BACKGROUND

      This section summarizes the parties' relationship and lays out uncontroversial facts. I resolve the disputed factual questions in later sections. In describing the background and making my findings of fact, the Court has considered the reporter's certified transcript, the exhibits admitted into evidence, and the Court's own notes, recollections, and impressions of the evidence.

Stryker manufactures medical implants.  The products relevant to this case fall into two categories: joint products, which are generally used in elective joint replacement surgeries, and trauma products, which are generally used in emergency surgeries after traumatic accidents.  Selling these Stryker products requires a specialized skillset; sales representatives ("reps") not only need to develop relationships with the surgeons to whom they sell, but they also need sufficient medical knowledge to advise and guide the surgeons in the use of Stryker products from inside the operating room.  Effective sales reps are the lifeblood of this market.

Stryker employs some of its own sales reps in and around Colorado through Summit Surgical, a fully owned subsidiary.  It also contracted with plaintiff ORP, an independent company with sales reps who sold Stryker products on commission.  A substantial portion of Stryker's joint and trauma sales in the region had, until the events in this case, come through ORP; and the two companies appear to have enjoyed a close working relationship.  Two documents comprised the bedrock of this relationship: the Joint Sales Representative Agreement ("joint SRA" or "joint contract") and the Trauma Sales Representative Agreement ("trauma SRA" or "trauma contract").[1]  Each of these contracts granted ORP the exclusive right to sell Stryker products in certain locations, specified which non-Stryker products ORP could and could not sell, and permitted either party to voluntarily terminate the contract so long as they complied with certain post-termination restrictions.  Both contracts provided that, in the event of such a termination, ORP would have to sit on the sidelines for a year — the provisions prohibiting ORP from selling products competitive with Stryker would survive the contract by twelve months.  In return, Stryker would have to pay ORP "restriction payments" equal to ORP's commissions from

---

[1] These contracts were made between Stryker, ORP (designated as "Representative"), and Mr. Petrides (designated as "Principal").

Stryker sales made in the twelve months before termination.  Both contracts also contained one-year non-solicitation/non-divert provisions that would survive the contract.[2]

The two companies' ties ran deeper than just contracts.  Some ORP principals had previously worked for Stryker; Stryker helped train ORP sales reps; and ORP sales reps sold more products from Stryker than any other manufacturer — and were generously rewarded for their efforts.

The companies' relationship soured.  Stryker brought in a new Area Vice President, Adam Jacobs, from its Houston office in October 2018.  On March 27, 2019, Mr. Jacobs informed Mr. Petrides that Stryker was terminating the joint contract for "cause."  When Mr. Jacobs terminated the joint contract, Stryker took the position that ORP had materially breached the contract and, as a result, Stryker was not bound by the contract's terms and was not obligated to pay restriction payments.  ORP took the position that Stryker did not have "cause" to terminate the joint contract, and that the voluntary termination payment obligations, sales restrictions, and non-solicit/non-divert covenants should have applied.

At the same time as it terminated the joint contract, Stryker offered ORP a deal: Stryker would still pay the restriction payments if ORP would waive the non-solicit/non-divert provision and allow Stryker to hire ORP sales rep James Demorest.  ORP declined.  A few months later, Stryker hired Mr. Demorest anyway.

The trauma contract remained in place, but Stryker informed ORP in October 2018 that it wanted to negotiate a mutually agreeable termination.  Mr. Jacobs sent Mr. Petrides two offers.

---

[2] The restriction payments were owed to "Representative," i.e., ORP.  Trauma Contract (Pl. ex. 5) § 16.3. The non-solicit/non-divert provision was made explicitly "for the reasonable protection of the Representative," and with the understanding that "any breach of the [non-solicit/non-divert provision] will result in irreparable harm and continuing damage to the Representative."  *Id.* at § 16.2.  Neither provision mentioned Mr. Petrides.

The first would have made ORP a Stryker agent.  ORP declined.  The second was essentially a buyout; it offered $8 million to terminate the trauma contract, waive the restriction payments, and permit Stryker to solicit and hire ORP's sales force.  Mr. Petrides met with Mr. Jacobs at a Starbucks and counteroffered: $13.6 million and a few other terms memorialized in shorthand on a sticky note.  Plaintiffs claim that Mr. Jacobs accepted the offer on the spot.  Stryker maintains that Mr. Jacobs agreed in principle to the bottom-line number but did not make a deal.  In any case, Mr. Jacobs sent Mr. Petrides a proposal on March 31, 2020.  This proposal partially tied the buyout price to Stryker hiring ORP sales reps.  ORP would receive $8 million for terminating the contract and waiving the non-solicitation/non-divert, and it would receive additional money for each sales rep hired by Stryker.  If Stryker hired all 14 ORP reps it wanted, ORP would receive the $13.6 million Mr. Petrides had requested.

This proposal deepened the fractures in the ORP-Stryker relationship.  According to Mr. Petrides, Mr. Jacobs paired the proposal with a threat: sign it by Friday April 3 or Mr. Jacobs would terminate the trauma contract for "cause" and refuse to provide ORP the restriction payments.  Mr. Petrides claimed to find the threat credible because, in his view, Mr. Jacobs had baselessly terminated the joint contract for "cause" just a few months earlier.  Mr. Jacobs denies having issued any such threat.

What happened next, however, is undisputed — Mr. Petrides decided to voluntarily terminate the trauma contract himself.  On April 3, 2020 Mr. Petrides provided Mr. Jacobs the requisite 30-day notice of termination.  This notice did not release the parties from their contractual obligations, including the one-year non-solicit/non-divert.  The trauma contract therefore ended at 11:59:59 p.m. on May 3, 2020.  Stryker offered to hire at least 11 ORP reps within the first two hours after the contract ended.  Within 48 hours, 12 ORP reps had been hired

by Stryker.  ORP alleges that Stryker impermissibly solicited and/or diverted these reps.  Stryker denies the allegations.

ORP sued on May 21, 2020.  ORP ultimately tried two claims before the Court: (1) corporate raiding; and (2) breach of contract, which included alleged breaches of both the joint and trauma contracts.[3]  Stryker brought four counterclaims: (1) breach of the joint contract; (2) breach of the trauma contract; (3) unfair trade practices; and (4) tortious interference.  Before the bench trial commenced, ORP sued the individual sales reps hired by Stryker for breaching their employee non-compete clauses in state court.  *ORP Surgical, LLC v. Bakersky*, 2020-cv-31839 (Denver Cnty. Dist. Ct. Mar. 24, 2022).  Stryker paid the sales reps' legal fees in that litigation, which recently settled.  Stryker has also sued a former Stryker employee who was also associated with ORP, Morgan Schilling, in New Jersey state court for allegations substantially similar to those made in its counterclaims, and that litigation is ongoing.  *See Howmedica Osteonics Corp., v. Morgan Schilling*, 2:20-cv-09621-CCC-CLW (D.N.J.).

The present litigation has been characterized by vigorous advocacy, to say the least.  Because of the volume and antagonistic nature of the discovery disputes that were occurring, the Court ultimately appointed a special master to assist in managing the discovery process.  *See* ECF No. 107.  That proved to be extremely helpful to the Court, but even by the time of trial there were pending appeals of certain special master rulings and, in particular, of his recommendation that Stryker and its counsel be severely sanctioned.  The Court will address those issues in this order as well.

---

[3] ORP voluntarily dismissed three of its six claims.  ECF No. 287.  The parties agreed during the pretrial conference to dismiss a fourth claim, violation of the Colorado Wholesale Representatives Act, Colo. Rev. Stat (C.R.S.) § 13-21-1303.  *See* ECF No. 307 at pp. 3–6.

## II.   LIABILITY

### A.  Joint Contract

Three features of the joint contract bear on this case: its sales restrictions, restriction payments provision, and methods of termination.  The contract prohibited ORP from selling all but a few "competitive products," that is, products that competed with a substantially similar product sold by Stryker.  Joint Contract (Pl. Ex. 4) § 6.3.  This sales restriction was to remain in force for 12 months after the contract's termination.  *Id.* § 16.1.1.  During those 12 months, Stryker would compensate ORP, as noted earlier in this order, with "restriction payments" equal to the commission ORP had received on Stryker sales in the previous year.  *Id.* §16.3.

However, Stryker would owe restriction payments — and ORP would be bound by the non-compete — if the contract were voluntarily terminated.  *See id.* § 2 (permitting voluntary termination).  ORP would lose its right to restriction payments only if it breached its duty of loyalty to Stryker, breached the agreement, or was terminated "for cause."  "Cause" included, *inter alia*, gross or persistent negligence, willful misconduct, willful failure to perform its duties, intentionally acting contrary to Stryker's interests, fraudulent misrepresentations, or bad faith. *Id.* § 16.4.

It is undisputed that Stryker terminated the joint contract, that it claimed "cause" to terminate, and that it did not pay ORP any restriction payments.  ORP claimed at the time and still maintains that Stryker did not have "cause" to terminate the contract and should have paid ORP restriction payments.  Mr. Petrides testified that ORP did not compete in the year after Stryker's termination in an attempt to remain eligible for the restriction payments.  Stryker

offered no evidence to the contrary.[4]  I find Mr. Petrides's testimony that ORP did not sell competitive products following the joint contract's termination to be credible.

Whether Stryker owes ORP restriction payments thus depends on whether Stryker had cause to terminate the joint contract.  I find that it did not.  At trial, Stryker asserted five independent "causes" for terminating the joint agreement: (1) ORP's selling competitive products; (2) ORP's holding back invoices, or "sandbagging;" (3) an ORP rep's improperly moving material between hospitals; (4) an ORP rep's being suspended from a hospital; and (5) insubordination.  I address those in turn.

The first allegation relates to ORP sales rep Scott Stapleford's allegedly selling Link BioCorp hip stems, a product similar to one made by Stryker.  ORP contends that Mr. Stapleford did not "sell" the Link stem, and that, in any case, the stem was not competitive.  I agree. Stryker's primary evidence for the alleged sale is a photograph of a Link stem on Mr. Stapleford's cart at Presbyterian St. Luke's Hospital and a work order from a hospital ordering a replacement stem to the hospital that says "attn: Scott Stapleford."  ORP explained that Mr. Stapleford's "cart" is not his but the hospital's, and that the Link stem was likely placed on the cart by a doctor.  Stryker's best evidence for this claim was the testimony of Dr. Tuttle, who worked closely with Mr. Stapleford.  Dr. Tuttle testified that he proactively asked Mr. Stapleford for the Link stems, and that Mr. Stapleford agreed to supply them in order to maintain the inside-track on Dr. Tuttle's surgeries.  This would ensure that Dr. Tuttle used Stryker's "cup" part of the hip replacement, which would give Stryker about half of the profits from the hip replacement.  The photograph, memo, and Dr. Tuttle's testimony show that Mr. Stapleford

---

[4] To the extent that Stryker argues that ORP's allegedly selling competitive SegWay products relieves Stryker of its joint-contract restriction payment obligation, I reject that claim for the reasons stated *infra*, subsection II.B.1 (discussing ORP's alleged breaches of the trauma contract).

provided Dr. Tuttle with hip stems but do not convince me that Mr. Stapleford "sold" the stems. I saw no evidence of Link stem commissions paid to Mr. Stapleford or evidence indicating that the hospital's Link stem supplier was anyone associated with ORP.  Mr. Stapleford's "providing" Dr. Tuttle with the stems might have been as innocuous as rummaging through a closet of hospital-owned inventory to find Dr. Tuttle's preferred stem.  And the "attn: Scott Stapleford" scribble does not prove by a preponderance of the evidence that Mr. Stapleford "sold" Link stems — the Court has no idea who wrote the line on the memo — which was not a bill of sale — or why.

More importantly, the evidence suggests that the Link stem was not a "competitive product," and selling it would not have been a breach of the joint contract.  Dr. Tuttle testified that the Link stem, a "Corail-type" hip stem, was not competitive with any product from Stryker, which sold no "Corail-type" hip stems at that time (it has since added a Corail-type stem to its inventory).  Taken together, this evidence does not suggest that Mr. Stapleford represented a competitive product in breach of the joint contract.  If a surgeon viewed the Link stem as categorically different than Stryker's stems, as Dr. Tuttle did, then the Link stem was not competitive.  Even were I to give the businessman's opinion of hip-stem interchangeability more weight than the medical doctor's, the evidence would show that Mr. Stapleford provided Dr. Tuttle with a hip stem at the doctor's request in order to preserve Stryker business — and it would not show that Mr. Stapleford personally profited from doing so.  This did not constitute "cause" to terminate the joint contract.

Stryker's claims about other supposed breaches are similarly unsupported.  ORP untimely submitted a number of invoices, but this was more likely a mistake than gross negligence or bad faith.  All late-submitted invoices concerned a single hospital and a short period of time.  Mr.

Petrides and others testified that the late submissions were a mistake, possibly caused by technological error; the mistake was promptly corrected; and, most importantly, Stryker pursued and hired the sales rep most responsible for the invoice issue, which it would not have done had it believed the sales rep willfully defrauded Stryker.

Stryker next claims that an incident in which Mr. Stapleford moved hospital-owned product from one hospital to another constituted "cause" for terminating the contract. The product was moved with both hospitals' full knowledge and consent in order to deal with the emergency of a patient on the operating table who needed the product immediately. Evidence shows that this type of inter-hospital cooperation was neither uncommon nor objectionable to Stryker, which claims to put patient outcomes above all else, and therefore did not constitute "cause" to terminate.

Another ostensible "cause" for termination was Mr. Stapleford's temporary suspension from one hospital. If this was a breach, I find it to be immaterial. Not only had Stryker known about Mr. Stapleford's suspension for months without objecting — possibly because Mr. Stapleford was suspended in part for too-ardently defending the Stryker business — but a number of similar suspensions handed out to Summit Surgical reps resulted in little to no discipline by Stryker. Stryker's pre-litigation conduct indicates that it did not consider the suspension to be cause to terminate the joint contract until it went digging for post-hoc legal justifications.

I take the same view of Stryker's last purported "cause," insubordination. Mr. Petrides was abrasive and difficult to work with. To some extent that was true of Mr. Stapleford as well. But Stryker did not mention insubordination as a cause for termination until litigation began.

In short, I find Stryker's purported excuses for terminating the joint contract for "cause" to be flimsy and lacking in credibility, especially in the context of the parties' long working relationship, and in the context of Stryker's offer to terminate the contract other than for "cause" and to pay the restriction payments if ORP would let Stryker hire Mr. Demorest.  When ORP refused to play ball, Stryker manufactured reasons to justify a for-cause termination.  This finding is further supported by my assessment of the credibility, or lack thereof, of the individual who terminated the contract, Adam Jacobs, discussed *infra.*  Because Stryker did not have "cause" to terminate the joint contract, ORP is entitled to the restriction payments outlined in section 16.3.  The amount is calculated in the damages section, *infra.*

**B.  Trauma Contract**

1.  Entitlement to Restriction Payments

The trauma contract contains a restriction payment provision identical to that of the joint contract.  The parties do not dispute that Mr. Petrides voluntarily terminated the trauma contract effective May 4, 2020.  They agree that absent breach of contract, ORP would be entitled to restriction payments.  Stryker alleges that ORP breached the trauma contract and therefore surrendered its right to restriction payments.  ORP disagrees.  As with the joint contract, I find that ORP did not breach the trauma contract and is therefore entitled to restriction payments per section 16.3.

Stryker identified three alleged breaches of the trauma contract: (1) ORP's selling competitive SegWay products; (2) ORP's breaching their inventory stocking agreements; and (3) misconduct by Mr. Morgan Schilling.  For the first claim, ORP admits to selling a SegWay carpal tunnel product similar to Instratek, a Stryker product, but blames Stryker for failing to facilitate ORP's switching from SegWay to Instratek.  The evidence supports ORP's claim.  When ORP began selling SegWay, Stryker did not have any competitive products.  Stryker

eventually bought Instratek and asked ORP to replace SegWay with Instratek.  ORP agreed but was unable to actually make the switch because Stryker never provided ORP training or inventory.  ORP repeatedly asked for training on Instratek and informed Stryker that it would continue selling SegWay while awaiting training so that it could maintain relationships with surgeons important to Stryker's business.  That was in 2018.  Stryker did not object then — possibly because ORP sold $25 million of Stryker product but only $150,000 of SegWay — and it cannot now claim that ORP's selling SegWay with Stryker's knowledge and tacit consent constituted "cause" to deny ORP restriction payments.

The second alleged breach concerns a Trauma Inventory Agreement (TIA) Stryker had signed with some hospitals.  This agreement obligated the hospitals to dedicate 90 percent of their shelf space to Stryker products, the hope being that doctors seeing predominantly Stryker products would be more likely to use Stryker for their surgeries.  Stryker alleges that ORP prevented Stryker from realizing the full benefit of its TIA by placing Acumed products on shelves reserved for Stryker.  I find insufficient evidence to support this claim.[5]  Stryker presented no hard evidence of misconduct by ORP, which was not even a party to the TIAs.

The same applies to the final alleged breach: misconduct by Morgan Schilling.  Here Stryker employed the spaghetti-throwing approach — but none of it stuck.  I found the record devoid of evidence that Morgan Schilling improperly promoted Acumed products to Stryker's detriment.  To the extent that Stryker's claim is that Mr. Schilling's involvement with ORP breached his personal non-compete, the record indicates that Stryker affirmatively requested that Mr. Schilling deal with ORP on its behalf.  Finally, Stryker's argument that Mr. Schilling's

---

[5] Stryker's third counterclaim, for unfair trade practices, is premised on this same alleged misconduct with respect to Acumed products.  *See* ECF No. 84 ¶¶ 138–45.  Because I find insufficient evidence of such misconduct, I find in plaintiffs'/counter-defendants' favor on this counterclaim.

financial stake in ORP caused ORP to be in breach of the trauma contract is unpersuasive. Mr. Schilling's close relationship with ORP was common knowledge among the parties — Stryker had no qualms with it until they needed a legal argument. And, in any case, Stryker has not shown how any alleged misconduct by Mr. Schilling affects *ORP*'s compliance with the trauma contract. If Mr. Schilling misrepresented his finances to Stryker — a claim I find unsupported by the evidence introduced at trial — Stryker might have a claim against Mr. Schilling but not against plaintiffs in this case. As I said at trial, the claims against Mr. Schilling belong in the New Jersey case, not here.[6]

Because I find that ORP was not in breach of the trauma contract, I find that Stryker owed ORP restriction payments. ORP's entitlement is calculated in the damages section, *infra*.

### 2. Solicitation/Diversion of ORP Sales Reps

Section 16.2 of the trauma contract, entitled "Manufacturer Non-Solicitation Covenant," prohibits Stryker from "directly or indirectly divert[ing] or solicit[ing], or attempt[ing] to divert or solicit, any current employee or independent contractor working for [ORP]." Under governing law, these terms must be "given their plain and ordinary meaning." *Digital Grp., Inc. v. Sagitec Sols., LLC*, 2017 WL 3568095, at *6 (N.J. Super. Ct. App. Div. Aug. 18, 2017). Plaintiffs claim that Stryker breached this provision of the contract. I agree.

Plaintiffs presented compelling evidence of solicitation and diversion that defendants and their witnesses could not credibly explain away. The alleged solicitation and diversion began

---

[6] Stryker's fourth counterclaim is based on similar conduct. It alleges that ORP and Mr. Petrides tortiously interfered with Stryker's employment contract with Mr. Schilling by "induc[ing], permit[ting], or incentiviz[ing] Schilling to violate" his contractual obligations to Stryker in order to move Stryker's business to ORP and unfairly compete with Stryker. ECF No. 84 ¶¶ 146–54. I find this counterclaim unsupported by the evidence. It appears that *Stryker* employees encouraged Mr. Schilling to liaise between the two companies despite his technically not being employed by either. And Stryker did not show how ORP's alleged actions sought to move Stryker's business to ORP or unfairly compete with Stryker.

after Mr. Petrides voluntarily terminated the trauma contract on April 3, 2020.  That evening, Mr. Jacobs emailed the "Dream Team" — all Stryker employees in the region and all ORP reps — informing them that Mr. Petrides had terminated the trauma contract.  He indicated that more guidance about the transition would be forthcoming and invited anyone with questions to contact him directly.  A number of ORP reps responded to the dream team email expressing shock at ORP's termination and a desire to continue selling Stryker products.  These reps testified that they had not heard about the termination until the dream team email, and that their responses were in no way coordinated.  This testimony strains credulity.  The reps' responses parroted one-another, and several of them were sent while the reps were together at a backyard barbecue.  The host of that barbecue, Pete Henderson, feigned shock in his email response sent mere seconds after hanging up the phone with Mr. Jacobs.  Mr. Jacobs had a form response ready for the reps' near-identical emails: "Thank you for reaching out and expressing interest in joining Stryker . . . . This email confirms that Stryker did not initiate your communication with us or your interest in working with Stryker."

The dream team email exemplifies my view of most of the evidence in this trial: while it might be logically possible to give Stryker the benefit of the doubt, it does not deserve it.  Its witnesses lacked credibility.  Stryker witnesses equivocated, spun far-fetched stories, and even made flat-out misrepresentations.  In one instance, Mr. Jacobs testified that he had "no contact whatsoever" with a particular ORP rep before that rep had applied for a Stryker position.  Call logs showed multiple phone conversations in that time.  Presented with the logs, Mr. Jacobs said he "could have answered the question better."  In another instance, Tim Sebald, general manager of the Summit Surgical branch, vehemently denied making any verbal offers to ORP reps until confronted with a text message showing the opposite.  In yet another, former-ORP rep Craig

Frey claimed ignorance of a phone call between Mr. Jacobs and Mr. Henderson hours before the dream team email.  He reversed course when presented a text showing him asking Mr. Henderson to "three-way [him] into the call."

Key issues in this case turn on credibility assessments.  One such question concerns whether Stryker diverted the ORP sales reps by promising legal representation and/or indemnification if ORP sued the reps individually.  Witnesses told conflicting stories.  Plaintiff witness Pete Kail, an ORP rep who did not jump to Stryker, testified that Stryker made him this promise.  Adam Jacobs testified that neither he nor anyone at Stryker promised legal representation or indemnification.  I credit Mr. Kail's testimony, not only because I found Mr. Jacobs incredible but also because other evidence supports Mr. Kail.  Hannah Olson, the wife of former-ORP rep Austin Olson, sent her husband an email that appeared to be a transcription or summary of a phone call Mr. Olson had with Stryker while he was still employed at ORP.  The notes reflect that Stryker promised Mr. Olson legal representation.  Mr. Frey, asked directly whether Stryker had promised him legal representation, claimed failure of recollection but said "I don't deny it."  Other reps testified, essentially in lock step, that they were not assured of legal representation, and that they were not solicited by Stryker.  I did not find that testimony to be credible.  Rather, I find that they were trying to support their current employer and perhaps the lawyers who prepared them for their testimony.  This was also evident in reviewing affidavits signed by the reps that included purported facts that the reps disclaimed when testifying at trial.

I find that plaintiffs have proved by a preponderance of the evidence that Stryker promised ORP reps legal representation and/or indemnification to come over to Stryker.[7]  I

---

[7] This conclusion is based on the evidence presented at trial.  I do not reach this conclusion to sanction Stryker for litigation misconduct.  Sanctions are discussed *infra*.

further find that such promises constituted "solicitation" and "diversion" within the plain meaning of those terms.  Stryker's offers of indemnification and/or solicitation were therefore breaches of the trauma contract.

Concluding that Stryker neither solicited nor diverted ORP reps would not only require me to find in Stryker's favor on the indemnification/representation issue, but it would also require me to accept Stryker's representations about multiple suspicious events and occurrences. It would require me to accept that no business was discussed at the March 10 dinner at Izakaya Den — a $750 Stryker-funded boozy dinner — despite the ongoing termination negotiations, the identity of the dinner's ORP reps (all of whom jumped to Stryker), and the fact that, the very next morning, Mr. Jacobs drove all the way to Steamboat Springs to discuss Pete Kail's possibly switching to Stryker.  Finding for Stryker would require me to accept that Pete Henderson had no knowledge of an incoming Stryker offer in Montana — a state to which he had never been — despite his accepting the offer in under four minutes and despite other ORP reps testifying that Stryker Trauma Sales Manager Michael Bonessi had called to inform them that offers were incoming.  It would require me to accept that hundreds of phone calls between Mr. Jacobs, Mr. Bonessi, and ORP reps were all benign — despite Stryker's attempts to conceal the very existence of these phone calls during discovery, and despite at least one ORP rep, Mr. Olson, testifying that a topic of conversation was his interest in joining Stryker.  And it would require me to believe that an untold number of Mr. Jacobs's and Mr. Bonessi's text messages were deleted by accident and contained no damning information despite a special master's recommending sanctions for failing to preserve these messages.  On the record before me, I cannot find in Stryker's favor.  I can only conclude that, despite its claims to the contrary, Stryker solicited and diverted the ORP sales reps.

Stryker argues that they could not have solicited or diverted the ORP reps because those reps would have come to Stryker of their own accord.  This argument bears on the question of damages, not liability.  The trauma contract prohibited *all* solicitation and diversion, not only necessary or effective solicitation and diversion.  Because I find that Stryker breached the contract by directly and indirectly soliciting and diverting ORP sales reps, I find that ORP is entitled to the damages.  *See* Part III *infra*.

### C.  <u>Corporate Raiding</u>

Plaintiffs also assert a claim for corporate raiding.  The parties have disputed this claim's viability from the get-go.  Defendants claim that corporate raiding is not a cognizable claim under Colorado law; and that, in any case, plaintiffs' claim is barred by Colorado's economic loss rule.  Plaintiffs disagree.  I declined to dismiss plaintiffs' corporate raiding claim on a motion to dismiss and noted that Colorado courts had "arguably" excluded intentional torts like corporate raiding from the economic loss rule.  ECF No. 120.  I again declined to dismiss the claim on a motion for summary judgment.  My order expressed skepticism about defendant's construction of Colorado law and found the economic loss rule dispute — which depends on whether plaintiffs differentiate the corporate raiding and contract claims — fodder for trial.  ECF No. 284 at p. 10.  The parties closed their corporate raiding dispute with trial briefs on the issue. *See* ECF Nos. 364, 373, 384.  In their final briefs, defendants again argued that corporate raiding is not a standalone cause of action in Colorado.  They argued alternatively that the economic loss rule bars plaintiffs' corporate raiding claim because the tort duty plaintiffs identify is duplicative of their breach of contract claim.  Plaintiffs respond that Colorado courts would recognize a corporate raiding claim and that the economic loss rule excludes intentional torts like corporate raiding.

16

Assuming without deciding that corporate raiding is a standalone cause of action in Colorado, I find that the economic loss rule bars plaintiffs' claims in this case.[8]  In my June 2021 order on defendant's motion to dismiss I found that Colorado courts had "arguably" excluded intentional torts like corporate raiding from the economic loss rule.  ECF No. 120.  A subsequent case, *Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 506 P.3d 108 (Colo. App. 2021), clarified that "the economic loss rule may preclude claims for negligence *and intentional torts*." *Id.* at 122 (¶ 62) (emphasis added).  Despite plaintiffs' request that this Court confine *Dream Finders Homes* to its facts, the case simply cannot be squared with plaintiffs' claim that intentional torts never run up against the economic loss rule.  *Dream Finders Homes* grappled with precedent that might support narrowing the economic loss rule and explicitly rejected a blanket exclusion of all intentional torts.  *Id.* (¶ 62) ("Dicta in [two Colorado cases] suggests that the economic loss rule has only limited applicability in intentional tort claims . . . , [but] no Colorado case had held that the economic loss rule can never apply to claims for fraud or other intentional torts.").  Because the economic loss rule can apply to intentional torts, the only question before me is whether it should apply to bar plaintiffs' corporate raiding claim.

I find that it should.  The economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).  If the claimed tort duty is "memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and [the] economic loss rule bars the tort claim." *Great Am. Opportunities,*

---

[8] The parties agree that, although the contract is interpreted according to New Jersey law, Colorado law governs the corporate raiding tort claim and economic loss rule analysis.

*Inc. v. Kent*, 352 F. Supp. 3d 1126, 1138 (D. Colo. 2018) (quotation omitted).  A court evaluates three factors to determine whether a contracting party owes an independent common law duty of care: "(1) whether the relief sought in tort is the same as the contractual relief; (2) whether there is a recognized common law duty of care; and (3) whether the tort duty differs in any way from the contractual duty."  *Hamon Contractors, Inc. v. Carter & Burgess*, 229 P.3d 282, 293 (Colo. App. 2009).

The first factor, relief sought, weighs against applying the economic loss rule.  Plaintiffs seek two types of damages for the corporate raiding claim: compensatory and punitive.  Punitive damages are unique to the corporate raiding claim.  They "are a distinct form of damages." *Seaward Const. Co. v. Bradley*, 817 P.2d 971, 973 (Colo. 1991); *see also id.* at 973 ("[W]hereas compensatory damages flow from the injury itself and are intended to make the injured party whole, punitive damages flow from the conduct of the defendant and are intended to punish the defendant and deter similar future acts by the defendant or others.").  The second factor, recognized duty of care, weighs slightly against applying the economic loss rule.  Corporate raiding seems to be a recognized common law cause of action in many states, *see* ECF No. 36 at pp. 2–3, although the parties have cited no case conclusively establishing that the cause of action exists in Colorado.  In any case, I am assuming for this analysis that Colorado courts would recognize a corporate raiding cause of action.

The third factor, difference between tort and contract duties, weighs decisively in favor of applying the economic loss doctrine and convinces me that plaintiffs "ha[ve] not shown any duty independent of the interrelated contracts and [the] economic loss rule bars the tort claim."  *Great Am. Opportunities,* 352 F. Supp. at 1138.  Plaintiffs have not differentiated the tort duty from the contractual duty, despite their recognition that the economic loss rule applies "***absent an***

***independent duty***." ECF No. 62 at p. 5 (emphasis in original). Plaintiffs earlier explained that "the corporate raiding claim is based upon Stryker's scheme to raid [1] ORP's personnel, [2] sensitive information, and [3] information of other manufacturers in order to harm ORP in the Medical Device Industry at large." *Id.* at p. 6. Scheme number one, to raid ORP's personnel, violated Stryker's contractual duty not to solicit or divert ORP personnel. Plaintiffs presented no evidence of schemes numbers two or three, raiding sensitive information or information of other manufacturers. A generous reading of plaintiffs' briefing might unearth a claim that Stryker breached an independent duty not to induce ORP employees to breach their own duties of loyalty to ORP. *See* ECF No. 364 at pp. 3–4 (describing a case that upheld liability for inducing a rival company's employees to breach their duties of loyalty towards their employer). But I find this duty encompassed in the contractual duty of good faith and fair dealing. Because plaintiffs' corporate raiding claim is not based on any independent duty not memorialized in the contract, I find that the economic loss rule applies to bar their claim.[9]

### III.   DAMAGES

#### A. **Damages**

##### 1.   Restriction Payments

Because Stryker did not have "cause" to terminate the joint contract, ORP was entitled to the restriction payments outlined in section 16.3 of that contract. The parties' damages experts agreed that the amount owed was $1,018,896. The contract provides that this amount was due in 12 equal monthly installments beginning March 2019. I award ORP $1,018,896 in damages plus applicable pre-judgment interest per New Jersey law.

---

[9] In any case, I would be unlikely to award plaintiffs punitive damages. Mr. Petrides and ORP deserve at least some blame for the way in which the companies' relationship ended, and they are certainly not saints. Stryker deserves to pay damages for its business conduct but not more. The propriety of Stryker's litigation conduct, however, is another matter.

Because ORP was not in breach of the trauma contract, I find that Stryker owed ORP restriction payments as outlined in section 16.3 of that contract.  The parties' damages experts quibble about the amount of restriction payments — defendant's expert says that the number proposed by plaintiffs' expert, $3,731,791.47, is about $155,000 too high.  Though the difference is negligible for a dispute of this size, I find plaintiffs' number more persuasive because it accurately reflects Stryker's commission statements.  I therefore find that ORP is entitled to $3,731,791.47 in restriction payments.  This amount was due in 12 equal monthly installments beginning May 3, 2020.  Thus, in addition to the joint contract restriction payments described above, I award ORP $3,731,791.47 in damages, plus applicable pre-judgment interest per New Jersey law, for the trauma contract restriction payments.

     2.   <u>Damages for Solicitation/Diversion</u>

Under New Jersey law, "plaintiffs have the burden of proving damages." *Caldwell v. Haynes*, 643 A.2d 564, 571 (N.J. 1994).  "[W]henever there is a breach of contract, . . . the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." *Salt Lake Trib. Publ'g Co., LLC v. Mgmt. Plan., Inc.*, 454 F.3d 1128, 1141 (10th Cir. 2006) (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1228 (N.J. 1984)) (alteration in original).  Stryker's solicitation and diversion are apparent, but the damages it owes ORP are not.  I asked for guidance on damages throughout the trial.  Neither party provided anything useful, and I cannot find after studying the record any principled basis on which to award damages on this claim.

Compensatory damages "flow from the injury itself and are intended to make the injured party whole." *Seaward Const.*, 817 P. 2d at 974.  In other words, compensatory damages seek to restore the non-breaching party to the position in which it would have been if the contractual breach had not occurred.  The parties and their damages experts went back and forth about the

economic impact of Stryker's poaching ORP sales reps, but they were fighting on the wrong ground. Stryker did not breach the contract by *poaching* ORP reps, it broke the contract by *soliciting and diverting* the reps. The proper measure of compensatory damages, then, would restore ORP to the position in which it would have been had Stryker neither solicited nor diverted the sales reps. In other words, compensatory damages would award ORP the money it lost from Stryker's solicitation and diversion.

The problem is, there was insufficient evidence that Stryker's solicitation and diversion tactics caused any sales rep to leave ORP for Stryker. When Mr. Petrides terminated the trauma contract, it left the sales reps without the ability to continue to sell Stryker products. But selling Stryker products was their main business. They had been trained to sell Stryker products, and they had developed relationships with surgeons and hospitals in their capacity as representatives of Stryker products. Losing the majority of their business and income was particularly concerning because it came shortly after the beginning of the COVID pandemic. It is no surprise that immediately after the reps were notified that Mr. Petrides had terminated the trauma contract, most of them began contacting Stryker to express an interest in continuing to sell Stryker products.

Moreover, several of the reps testified that they were poorly treated by Mr. Petrides, who was abrasive and, at times, even abusive to them. Some testified that they were already looking for opportunities to move on. With the exception of Mr. Kail, none of the reps expressed any institutional loyalty to ORP or Mr. Petrides. I found this part of their testimony credible.

Thus, I cannot find that Stryker's solicitation and diversion caused these reps to go over to Stryker. On the contrary, I find that the reps likely, almost certainly, would have accepted offers of employment at Stryker without any solicitation or diversion at all. It is true that Mr.

21

Petrides threatened to sue his reps for breaching their individual non-competes if they went to Stryker — and many of the reps found this threat credible. I am not convinced, however, that Stryker's expressly or implicitly promising to pay the reps' attorney's fees if they were sued is what convinced them to come over. The other factors – the need for a job, their ties to Stryker products, the significant incomes they were making – were powerful draws. Moreover, two witnesses testified that it was industry standard for a new employer to pay for attorney's fees if a sales rep were to be sued by his or her previous employer. I suspect that the word would have gotten around. In any event, I find that plaintiffs did not prove otherwise and, therefore, they failed to prove any actual damages caused by the solicitation.

Plaintiffs argue that, in the event that actual damages are too difficult to calculate, fortune smiled upon this Court by providing a bargained-for valuation of Stryker's solicitation. During buyout negotiations before the trauma contract's termination, Adam Jacobs put a dollar value on each individual ORP rep that Stryker wanted to hire. Plaintiffs suggest the Court should use these numbers and award ORP the value Mr. Jacobs assigned to the reps that left ORP. I find this number inappropriate for two reasons: First, Mr. Petrides did not agree to Mr. Jacobs's numbers. Had he accepted Jacobs' proposal, this case would never have existed. But he did not. Nor is there evidence that he agreed with the dollar value that Jacobs assigned each rep.

Second, and more importantly, the numbers assigned to each individual sales rep do not reflect the value of Stryker's breach. Mr. Jacobs suggested, for example, a value of about $1 million for Stryker to solicit, divert, *and hire* Pete Henderson. Even had Mr. Petrides agreed to that number, it would have shown only that the parties believed $1 million dollars to be appropriate compensation for Stryker's soliciting, diverting, *and hiring* Pete Henderson. But damages must reflect the breach of contract's value; in this case, soliciting and diverting (not

hiring).  The $1 million figure — and all other values assigned to individual reps — are overinclusive because they represent the value of Stryker's breach plus the value of hiring the reps.  Despite plaintiffs' suggestion, there is no agreement by the parties about the isolated value of Stryker's soliciting and diverting the sales reps. [10]

This order should not be misconstrued as an indication that Stryker's conduct in soliciting and diverting ORP's sales reps was ok.  It was not.  It was in breach of its contractual obligation to ORP, and the misconduct was amplified by Stryker's sneaky attempts to mask what its management personnel, primarily Mr. Jacobs, were doing.  But the Court cannot award damages where damages were not proved.  Instead, the Court awards $1.00 in nominal damages for Stryker's breach of the non-solicitation provision in the trauma contract.  *See Salt Lake Tribune Publ'g*, 545 F.3d at 1141 (finding nominal damages appropriate where actual damages are not proven).

### B.  Costs and Fees

Section 18 of both the joint and trauma contracts provides that "[e]ach Party," meaning Stryker, ORP, and Mr. Petrides, "shall indemnify, defend, exonerate, and hold the other harmless from and against the other for any and all claims, suits . . . (including, without limit, reasonable attorney's fees and expenses) . . . arising out of or relating to any breach of this Agreement by the indemnifying Party."  That could be applied to indemnify a party against a third-party lawsuit arising from the other party's breach.  The Court interprets the plain language as also applying to

---

[10] Plaintiffs' damages expert also calculated disgorgement damages.  Disgorgement damages focus on the wrongdoer party — they seek to strip the breaching party, Stryker, of the gains that it made by wrongdoing, soliciting, and diverting.  These damages are impossible to calculate for the same reason that compensatory damages are incalculable.  Because it seems that Stryker's solicitation and diversion did not change the number of reps that Stryker would have hired, I cannot conclude that Stryker's finances would have been different had it not breached the trauma contract by soliciting and diverting the ORP reps.

claims by one of the parties that the other party breached the agreement.  Because Stryker breached the trauma contract by soliciting and diverting ORP's sales reps and by refusing to pay restriction payments due under that contract as well as restriction payments due under the joint contract, ORP and Mr. Petrides are entitled to reasonable attorney's fees and expenses.

### C.  <u>Sanctions</u>

The Court appointed retired state court judge Charles M. Pratt, now associated with the Judicial Arbiter Group, as a special master to handle discovery and other disputes.  The decision to appoint a special discovery master was the Court's, but the individual selected was recommended to the Court by the parties.  Special Master Pratt worked long and hard on the case and issued numerous reports recommending resolutions of disputes.  He also recommended sanctions against Stryker on more than one occasion.

In report number 8, he found that Stryker did not fulfill its duty to preserve and protect Mr. Jacobs and Mr. Bonessi's text messages after December 20, 2019.  ECF No. 238 at p. 8.  He recommended spoliation sanctions including that a negative inference be drawn, but he also recommended that the sanction be reduced if the relevant text messages were recovered from other phones.  *Id.* at pp. 7–8.  The missing text messages turned up shortly after the sanction recommendation was issued.  In a November 12, 2021 order, ECF No. 284, I "assume[d] for now that the text messages have indeed been recovered and produced," ECF No. 284 at p. 7, based on defendant's November 1, 2021 representation that "***all texts between the Sales Reps and Mr. Jacobs and/or Mr. Bonessi during the alleged spoliation period are being produced today***," ECF No. 263 at p. 1 (emphasis in original).  I chose not to impose any sanction.

In report number 13, Special Master Pratt found that Stryker and/or its counsel had engaged in three types of misconduct.  ECF No. 286.  First, he found that Stryker attorney Robyn Marsh of the Seyfarth Shaw LLP law firm had behaved inappropriately, disruptively, uncivilly,

and unprofessionally in defending Stryker recruiter Amy Shackelford's deposition.  He suggested that a reprimand from the Court would be appropriate.  Second, he found that Stryker's lawyers had both improperly coached and insufficiently prepared their witnesses. Stryker had an obligation to produce a 30(b)(6) witness prepared to testify about Stryker's compensation to the former ORP reps, including any promises to pay legal fees or indemnify the reps if they were sued by ORP.  The designated witnesses, however, declined to answer questions about compensation and indemnification either because they were unprepared or because objections and instructions from Stryker's counsel encouraged them to stonewall the questioner.  Third, he found that Stryker fell "significantly" short of its obligation to timely and completely disclose relevant documents.

Considering the totality of the circumstances, the Special Master recommended (1) that Stryker be deemed to have admitted that it agreed to supply defense costs and provide indemnification for the former ORP reps; and (2) that the Court order Stryker to reimburse ORP for two-thirds of ORP's Special Master fees and costs.  Defendants asked the Special Master to reconsider report number 13, but he stuck to his guns in report number 15.  ECF No. 310.

I did not impose the recommended sanctions at that time.  I was concerned, frankly, about deeming Stryker to have offered to pay the ORP reps' legal fees as a sanction, because I knew this was a disputed fact issue that could affect the outcome of the trial, and I wanted to hear the evidence about that alleged solicitation myself.  It turns out that the evidence has convinced me that what the Special Master recommended that I deem to be true as a discovery sanction was in fact true.  That still leaves open an appropriate sanction for the discovery misconduct.

The parties have since filed motions to supplement the record with respect to the Court's consideration of the Special Master reports.  ECF Nos. 353, 396.  Plaintiffs claim that, despite

defendant's unequivocal representation following the Special Master's first sanction recommendation, it did not produce all of the text messages between the sales reps and Messrs. Jacobs and Bonessi, because counsel had (1) stripped the messages of all images and attachments; (2) not produced Mason Miller's text messages; and (3) left a suspicious gap in a message chain between Mr. Frey, Mr. Jacobs, and Mr. Henderson.   Defendant responds by assuring the Court that "nothing is missing, everything has been produced."   ECF No. 361 at p. 1.   Defendant further claims that any late-produced files were the result of technical difficulties about which the parties were collaborating, and that there is nothing suspicious about gaps in conversations. Defendants then filed their own motion to supplement in which they highlight comments by the judge in the state court case between ORP and its former reps in which the court indicated displeasure with ORP for nitpicking Stryker's discovery conduct.   ECF No. 396. Plaintiffs respond by justifying their diligence and repeating that the special master took issue with Stryker's conduct.

After considering all the evidence and arguments, I find that Stryker failed to meet some of its preservation obligations, and that Stryker's counsel turned this case sour with nasty litigation tactics.   As I stated during the trial, I was "appalled" at Stryker's lawyers' "playing fast and loose" with discovery obligations.   I agree with the Special Master that Stryker's failure to preserve text messages in December 2019 was either willful misconduct or gross negligence. That action may have become water under the bridge with the recovery of most text messages. [11] But Stryker's counsel's November 1 representation that "**all texts between the Sales Reps and Mr. Jacobs and/or Mr. Bonessi during the alleged spoliation period are being produced**

---

[11] Messages between the ORP reps and Stryker representatives were recovered.  Messages between Stryker employees Mr. Jacobs and Mr. Bonessi were not.

*today*," ECF No. 263 at p. 1 (emphasis in original), was simply untrue.  Even if Stryker had produced key images and attachments (which it had not), Mason Miller's text messages were not produced until February 11, 2022.  Stryker could have said it was producing "all available text messages" or was working with plaintiffs' IT people to sort through technical difficulties, but it chose to use unequivocal language on which the Court relied.

Moreover, I find the Special Master's observation about Stryker's counsel's coaching and failing to prepare 30(b)(6) witnesses properly, abusively defending Ms. Shackelford's deposition, and delaying discovery to be credible.  I reviewed a video of a portion of the Shackelford deposition, and I agree that defense counsel's conduct was rude, unprofessional, and inappropriate.

This conduct by lawyers of a respected Chicago-based law firm convinces me that sanctions are appropriate but, like the Special Master, I struggle to find the appropriate ones.  The Special Master believed — as do I — that the sanctions should have teeth.  That is why he recommended presuming a pivotal fact at trial.  He recognized that this would have been a severe sanction but said that he could not think of "a lesser but sufficient sanction."  ECF No. 310 at p. 3.  Obligating Stryker to reimburse two thirds of ORP's Special Master costs is insufficient — the Special Master considered this a minor sanction.  Requiring Stryker to reimburse plaintiffs' attorneys fees is insufficient — the contract already requires such reimbursement (were that not the case, I would likely have ordered defendant to reimburse plaintiffs for the attorney's fees and costs plaintiff incurred during the discovery process).  Plaintiffs suggested that a Colorado state court judge in El Paso County had trebled attorney's fees in a similar situation.  That has some teeth, for sure, but it strikes me as excessive in the context that defendant is already required to pay plaintiffs' attorney's fees.

The Court orders defendant and its counsel to reimburse plaintiff for the full amount of plaintiffs' share of the Special Master's fees and costs. Half of this reimbursement should be paid by Stryker for its failure to preserve text messages, and the other half should be paid by the Seyfarth Shaw LLP law firm for the misconduct of counsel during the discovery process. The Court also admonishes counsel. This was a large, important case for both parties. The parties were entitled to zealous advocacy from their outside counsel and from their inside corporate attorneys. However, zealous advocacy does not justify abusive conduct or hiding the ball.

## IV.    PENDING MOTIONS

Some housekeeping:

- ECF No. 298, defendant's renewed motion for the special master to reconsider report 13 is GRANTED. The Court referred the motion to the Special Master, ECF 300, who took another look at report number 13 and declined to alter it, ECF No. 310.

- ECF No. 321, defendant's motion for an equal allotment of trial time, is DENIED AS MOOT. The Court granted both parties sufficient trial time.

- ECF No. 353, plaintiffs' motion to supplement the record with regard to the Court's consideration of special master reports 8 and 15, is GRANTED as explained above.

- ECF No. 358, defendant's motion to allow testimony on March 4, is DENIED AS MOOT. The Court allowed testimony on that day.

- ECF No. 370 (public entry at 379), plaintiffs' motion to admit late-produced evidence and amend the trial exhibit list, is DENIED AS MOOT. The Court ruled on specific evidentiary issues at trial.

- ECF No. 386, defendant's Rule 52(c) motion on liability and causation and renewed rule 52(c) motion on damages, is DENIED.  The Court resolved all of the disputes in its judgment on the case.

- ECF No. 396, defendant's motion to supplement the record with regard to the Court's consideration of special master reports 8 and 15, is GRANTED as explained above.

## V.    ORDER

As explained above, the Court orders the following:

1. Judgment be entered in favor of defendant on plaintiffs' first claim for relief, corporate raiding.

2. Judgment be entered in favor of plaintiffs on their second claim for relief, breach of contract.

3. Judgment be entered in favor of plaintiffs / counter-defendants on all counterclaims.

4. Stryker is ordered to pay to ORP $1,018,896 in damages, plus applicable pre-judgment interest, for not providing ORP restriction payments after the joint contract was terminated.

5. Stryker is ordered to pay ORP $3,731,791.47 in damages, plus applicable pre-judgment interest, for not providing ORP restriction payments after the trauma contract was terminated.

6. Stryker is ordered to pay ORP $1.00 in nominal damages for breaching the trauma contract by soliciting and diverting ORP's sales reps.

7. Stryker is ordered to pay the reasonable attorney's fees and costs incurred by ORP and Mr. Petrides, as required by the joint and trauma contracts.

8. Stryker is ordered to reimburse plaintiffs for plaintiffs' share of the Special Master's fees and costs as a sanction.  Half of the reimbursement is to be paid by Stryker, and the other half is to be paid by the Seyfarth Shaw law firm.

9. ECF No. 298 is GRANTED.  The Special Master did reconsider the recommendation but declined to change it.

10. ECF No. 321 is DENIED AS MOOT.

11. ECF No. 353 is GRANTED.

12. ECF No. 358 is DENIED AS MOOT.

13. ECF No. 370 (public entry at 379) is DENIED AS MOOT.

14. ECF No. 386 is DENIED.

15. ECF No. 396 is GRANTED.

16. The Court directs counsel to confer and attempt in good faith to resolve the matters of reasonable attorney's fees, costs, and prejudgment interest.  If agreement cannot be reached, then the parties may set an evidentiary hearing or submit the issues to the Court on briefs of no more than 10 pages per side.

DATED this 10th day of May, 2022.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge