IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01450-RBJ

ORP SURGICAL, LLP, a Colorado limited liability company, and
LEE PETRIDES,

      Plaintiffs,

v.

HOWMEDICA OSTEONICS CORP, a New Jersey corporation,

      Defendant.

---

## ORDER ON ATTORNEY'S FEES, SANCTION, COSTS, AND PREJUDGMENT INTEREST

---

In this order the Court awards plaintiffs $2,217,448.50 in attorney's fees; $70,473.85 as a discovery sanction; $98,366.22 in costs; and $446,456.12 in prejudgment interest. A Second Amended Judgment will issue accordingly.

## I. BACKGROUND

This case involves a dispute between the manufacturer of medical devices, Howmedica Osteonics Corporation, commonly referred to as "Stryker," and a former distributor of Stryker products, ORP Surgical, LLP and its President, Lee Petrides. Plaintiffs alleged that Stryker breached two contracts, referred to as the "joint contract" and the "trauma contract," when it failed to pay "restriction payments" following termination of the contracts; and that Stryker further breached the trauma contract by soliciting ORP's sales representatives to leave ORP and work for Stryker.

The case was tried to the Court from December 13, 2021 to December 17, 2021 and March 1-4, 2022.  The interruption between the two phases of the trial was due to Covid and scheduling issues.  The Court issued its Findings of Fact, Conclusions of Law, and Order of Judgment on May 10, 2022.  ECF No. 398.  Judgment entered on the same date.  ECF No. 400.  Following post-trial motions, the Court issued Amended Findings of Fact, Conclusions of Law and entered an Amended Judgment on August 15, 2022.  ECF Nos. 420 and 422.

In its Amended Judgment the Court awarded plaintiffs $1,018,896 in damages for defendant's failure to provide "restriction payments" following termination of the joint contract; $3,731,791.47 in damages for failure to provide restriction payments following termination of the "trauma contract;" $1.00 in nominal damages for soliciting ORP's sales representatives; reasonable attorney's fees and costs in amounts to be determined; additional attorney's fees as a sanction for discovery misconduct; and prejudgment interest in an amount to be determined. ECF No. 422.

The amounts of attorney's fees, the sanction, costs, and prejudgment interest have been addressed by the parties in their briefs, a hearing on October 12, 2022, and various supplements to their previous briefs.  The Court has considered those filings and the evidence and arguments presented during the hearing.  In this order it addresses each of the issues in turn.

## II.  ATTORNEY'S FEES.

Generally, in determining the reasonableness of attorney's fees, the Court starts with the "lodestar" (reasonable hours times reasonable rates), which is presumptively reasonable.  *See Robinson v. City of Edmund,* 160 F.3d 1275, 1281 (10th Cir. 1998).  However, the lodestar can be adjusted after applying factors such as those articulated in *Johnson v. Georgia Highway Express,*

*Inc.*, 488 F. 2d 714 (5th Cir. 1974).[1]  The Colorado Rules of Professional Conduct provide a similar list of relevant factors.[2]  In the present case plaintiffs' lead counsel was retained on a combination of hourly rates and contingency fee.   However, the parties agree that any determination of attorney's fees in this case should be made on a lodestar/*Johnson* factors basis.

### A. <u>Lodestar (through May 31, 2022)</u>.

1. <u>Reasonable hours</u>.

Plaintiffs initially retained Halpern May Ybarra Gelberg, a California law firm, to investigate potential claims.  ORP's general counsel William O'Rourke also worked on the case at that time.  After determining that a lawsuit would be filed in Colorado, plaintiffs switched to Denver-based Sherman & Howard LLC.  The case was filed in this Court on May 21, 2020. Approximately ten months later plaintiffs determined that they could not to continue to afford Sherman & Howard's rates, and they retained a smaller Denver law firm, Richards Carrington, LLC which took over on a mixture of reduced hourly rates plus a partial contingency fee.

In March 2021, at approximately the same time that plaintiffs were retaining Richards Carrington, Stryker filed counterclaims asserting that plaintiffs had breached the joint and trauma contracts, engaged in unfair trade practices, and tortiously interfered with Stryker's employment

---

[1] *Johnson* lists 12 factors for courts to consider in determining reasonableness: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required; (4) preclusion of other employment; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney's; (10) the undesirability of the case; (11) the nature and relationship of the professional relationship with the client; and (12) awards in similar cases.  *Id.* at 717-19.

[2] The Colorado Rules of Professional Conduct are found as an Appendix to Chapters 18 to 20, COLORADO COURT RULES – STATE (2018).  These factors identified in Rule 1.5 are (1) time and labor required, (2) likelihood of preclusion of other employment, (3) fee customarily charged in the locality, (4) amount involved and results obtained, (5) time limitations imposed by the client or circumstances, (6) nature and length of the professional relationship, (7) experience, reputation, and ability of the lawyer(s), and (8) whether the fee is fixed or contingent.

agreement with a former employee.  Plaintiffs' liability insurer retained the Denver office of

Wilson Elser Moskowitz Edelman & Dicker LLP to defend against the counterclaims.  However,

after Stryker dismissed the unfair trade practices counterclaim in November 2021, the insurer

withdrew the defense; and plaintiffs retained Robert B. Hinckley Jr. and Sarah Marie

Andrzejczak, formerly of Wilson Elser and now of the Buchalter Law Firm, to complete the

defense against the remaining counterclaims.

Plaintiffs initially requested an attorney's fees award of $3,220,467 for 6420.5 hours of

work.  ECF No. 407 at 2.  The detailed billing records show that this amount covered time

entries through May 31, 2022.  ECF No. 407-1 at 3-130.  The Court entered its original judgment

on May 10, 2022, so this application included a small amount of post-judgment time.  Most post-

judgment time will be discussed in a later section of this order.

Christopher P. Carrington was  the lead lawyer for the plaintiffs once Richards

Carrington, LLC replaced Sherman & Howard.  According to his declaration, he and colleagues

reviewed all of the time entries across plaintiffs' law firms and eliminated 954.8 hours in order to

eliminate time billed for the transitions among the law firms and time that they found to be

unnecessary or duplicative.  ECF No. 407-2 at 4.  The specific time eliminated is detailed in

Exhibit 1 to the motion, ECF No. 407-1 at 131-139.  This review eliminated 14 timekeepers

entirely, including Mr. O'Rourke.

In its response to the motion Stryker asserted that "ORP's hours are inflated and should

be adjusted downward."  ECF No. 416 at 4.  This position was based primarily on two things: the

Affidavit and testimony of a retained expert, John Lebsack, a partner in the Denver law firm

White & Steele; and an annotated copy of plaintiffs' spreadsheet containing brief, often one

word, objections to unspecified portions of time entries.  ECF No 416-4.

4

Mr. Lebsack criticized plaintiffs for not submitting actual fee invoices or rate information. *Id.* at 3. However, plaintiffs did submit the exact time entries and associated rates with their request, just compiled in spreadsheet form to make it easier for the Court (and Stryker) to review rather than separate billing records for each of the various law firms. *See* ECF No. 407-1.

Mr. Lebsack also expressed the opinion that a case of this complexity should require two partner-level attorneys, one or two associates, and one or two paralegals. ECF No. 416-2 at 3. *Id.* I am not persuaded. Given the transition among law firms, the case inevitably involved a higher number of timekeepers; but Mr. Carrington's declaration that he eliminated transition time to account for the inefficiency stands unrebutted. Second, and more importantly, the extremely vigorous defense, including its prosecution of its counterclaims, increased the burden on the plaintiffs beyond what might otherwise have existed.

I invited Stryker voluntarily to identify the number of hours its legal team (from two national law firms and in-house counsel) billed in this case, for comparison purposes, but the information was not provided. I do note, however, in the related state court case between ORP and its former sales representatives, the defense team consisted of five partners (three from Davis Graham & Stubbs LLP and two from Seyfarth Shaw LLP), five associate or contract attorneys (four Davis Graham, one Seyfarth), and one paralegal. *See* ECF No. 407-3 (Declaration of Brett C. Painter).

Mr. Lebsack also criticized plaintiffs' counsel for "block billing." This criticism was aimed mostly at the Halpern May and Richards Carrington law firms, in particular the time entries of Molly Ballard of the latter firm. ECF No. 449 at 114. Mr. Lebsack acknowledged that the fact that block billing occurred does not mean that the time was not spent. However, because

block billing reduces the ability to review the time entry for reasonableness, he believes that each block time entry should be reduced by 20%. ECF No. 449 at 117. His calculations were provided in Hearing Exhibit M.

Again, I am not persuaded. I understand that block billing makes it more difficult for the reviewer (or the client) to know precisely what portions of the time entry were spent on which of the described tasks, and that courts have expressed criticisms of the practice. But reducing the block entries by 20 percent is arbitrary. Moreover, to the extent that the criticism is directed at the Richards Carrington firm, I accept the unrefuted representation that Mr. Carrington and his colleagues reviewed the time entries and eliminated transition and other unnecessary or duplicative time. To the extent that the criticism is directed at the Halpern May firm, I find that it is moot, because I intend for other reasons to eliminate that time.

As for Stryker's annotations on plaintiffs' spreadsheet, ECF No. 416-4, I described this exhibit during the hearing as a "sea of yellow," as it objects to the majority of the time entries. The objections are hardly specific, consisting of comments next to a time entry like "vague," "state court case," "overbilling," "withdrawn claim," and "administrative," without further explanation. Many of the objections, particularly "vague" and "state court case," are directed at Halpern May time entries and are moot. *Id.* at 2-3. "Overbilling" and "excessive billing" objections assert that the time is duplicative but do not address Mr. Carrington's representation that transition and duplicative time has been eliminated. Labeling a time entry "withdrawn" apparently means that the time was spent on a claim that was later withdrawn. It does not explain why the time was not usefully spent in the prosecution of the case. Significantly, this exhibit is not even referenced in the body of Stryker's objection to the fee application.

Nevertheless, I agree with Stryker's arguments on elimination of two categories of time that were included in plaintiffs' spreadsheet: the Wilson Elser time, because the fees were paid by an insurance carrier which has not asserted a claim or taken a lien; and the Halpern May time, because it involved pretrial consulting and investigation, not work on this case as such; moreover, at least some of the time was applicable to what became the state court case.  *See* ECF No. 449 at 65-66, 81.

In reply to Stryker's objections, plaintiffs cut another 66.5 hours, corresponding to a reduction of their request by another $34,089.  ECF No. 418 at 7.  Thus, by the time of the hearing, plaintiffs were seeking fees of approximately $3,187,000.  I have reviewed the 66.5 hours removed.  *See* ECF No. 418-4 (time entries shown as "REMOVED").  I find that more than half of the time "removed" was time I had already excluded when I excluded Wilson Elser time.  But I will remove the following additional hours: Carrington, 1.4 hours; Johnston, 2.3 hours; Hudgens, 2.5 hours; Hinkley/(at Buchalter firm) 16.6 hours; DeWeese, 1.3 hours; Leget, 5.4 hours; and Koclanes, 5.4 hours.

The number of hours that the Court finds to be reasonable together with the rates that I find to be reasonable are set forth in a chart below.

2. <u>Reasonable rates</u>.

The Richards Carrington firm agreed to bill at a "reduced hourly rate" plus a contingency fee.  ECF No. 440-2 (fee agreement, restricted access).  The hourly rates were $435 for Senior Partners; $335 for Junior Partners and Of Counsel attorneys; $275 for associate attorneys; and $135 for paralegals.  *Id.*[3]  The additional contingency fee is 30% of the "Net Amount Collected,"

---

[3]  The fee agreement gave Richards Carrington the right to raise these rates by up to 5% once each calendar year  *Id.*  I am not aware of any evidence the rates were ever increased.

which includes the damages awarded (and recovered), plus any court-awarded costs or attorney's fees, less the attorney's fees and expenses plaintiffs have incurred in the litigation.  Mr. Carrington indicated during the hearing that the effect of this complicated contingent feature is to add something in the range of 15% to the hourly fees.  ECF No. 449 at 97.

Rather than trying to include the contingency piece in the fee application (which would be awkward since the contingency is applied to the net amount collected including fees awarded), Mr. Carrington proposed that plaintiffs' counsel's hours be billed at a rates derived from considering the rates actually charged by Sherman & Howard; publicly available information about the rates charged by Holland & Hart (co-counsel for Stryker) as of 2016; the rates charged by Davis Graham & Stubbs (co-counsel for the sales representatives in the related state court case); and the rates charged by the Seyfarth Shaw lawyers in the state court case. This approach resulted in the proposal that partners with more than 25 years' experience be assigned the rate of $650 an hour; partners with less than 25 years' experience be assigned the rate of $575 an hour; associates with more than 10 years' experience be assigned the rate of $455 an hour; associates with more than 10 years' experience be assigned the rate of $380 per hour; and paralegals be assigned the rate of $235 an hour.  ECF No. 407 at 5-7.  Plaintiffs cited numerous cases in which judges in this district have found rates in this range to be reasonable. *Id.* at 7-8.

Stryker vehemently objected to the use of "hypothetical" rates rather than rates actually billed.  Although I understand the reason for plaintiffs' approach, and I generally agree that the proposed blended rates are within the range that judges here have found to be reasonable, I ultimately agree with Stryker on this point.  The actual rates billed provide a better base for this particular case.  The Court can account for the partial contingent fee through the *Johnson* factors.

Moreover, setting rates according to years of experience, while a method used by some rate surveys, disregards the quality of the work as observed by this judge in this case.

Stryker has not challenged the rates actually charged by the Richards Carrington firm, nor could it reasonably do so. From a declaration in support of a fee application by the defendants in the related state court case we know that the time of Michael Wexler, a partner at Seyfarth Shaw and the lead lawyer for Stryker in the present case, was billed at $787 per hour. ECF No. 407-3 at 4. Justin Beyer, another Seyfarth partner who was an extensive participant in the present case before and at trial, was billed at $590 an hour in the state case. *Id.* Robyn Marsh, the Seyfarth associate attorney who was active in discovery and at trial in the present case, was billed at $535 an hour in the state case. *Id.*

In *Ebonie S. v. Pueblo School Dist.,*60, No. 1:09-cv-0858-WJM-MEH, 2016 WL 1110442, at *8 (D. Colo. Sept. 8, 2017, Judge Martinez found the rates charged in 2016 for the time of Maureen Witt ($530) and Jon Bender ($425), two of the Holland & Hart lawyers who worked on the present case, to be reasonable, as was $220 an hour that was charged by their paralegal at that time. Their rates in the present cased likely were equal to or greater than their 2016 rates. The Davis Graham lawyers who were co-counsel with Seyfarth Shaw in the state court case were billed at $475, $450, and $441 for partners; $435, $410, and $325 for associates; $350 for a contract attorney; and $250 for a paralegal. ECF No. 407-3.

The hourly rates billed by the Richards Carrington firm in this case are low by comparison (and by comparison to rates found reasonable by other judges in this district, cited in ECF No 407 at 7-8). However, the quality of the firm's work, as I have observed it before, during and after the trial in the present case, is at least equal to if not in some instances superior to that of the lawyers from Seyfarth Shaw, Holland & Hart, and Davis Graham.

The Buchalter lawyers who defended against the counterclaims after plaintiffs' liability carrier terminated the defense being provide by Wilson Elser billed at agreed rates of $495 an hour for Mr. Hinkley, the partner; $395 an hour for Ms. Andrzejczak, an associate; and $125 for paralegal and other litigation support personnel. *See* ECF No. 440-1 (fee agreement, restricted). Those rates are similar to the rates charged by the Davis Graham team in the state case and lower than the rates billed by Seyfarth Shaw and Holland & Hart in the present case. They are within or lower than the rates approved by judges in this district in the cases referenced above. My observation of their work was that it was of good quality comparable to that of the defendant's' team.

The rates charged by the Sherman & Howard lawyers were $650 an hour for members/partners Peter Koclanes and Dawn Leget; $575 for member Nick DeWeese; $380 for former member Adrian Leonard; and $235 for paralegal Joanna Robarge. ECF No. 407-1 at 1.[4] The rates are somewhat higher than the rates charged by Richards Carrington and Buchalter firms; similar to the rates probably charged by the Holland & Hart lawyers; and lower than the Seyfarth Shaw rates. Once again, these rates are within the range of rates approved as reasonable by several judges in this district. *See* ECF No. 407 at 7-8.

Plaintiffs state that they considered using rates in the Laffey Matrix, a tool used by some courts in the Washington-Baltimore area, but Ms. Witt talked them out of that. ECF No. 407 at . I had not previous heard of that source, so out of curiosity I Googled it. The schedule of lawyer rates in that index for 2020-2022 ranged from $372 to $919 an hour, depending on the lawyer's

---

[4] In its most recent brief, Response to Plaintiffs' Second Supplement, Stryker objects to the rates of firms other than Richards Carrington as lacking foundation and being inadmissible hearsay. ECF No. 450 at 7. However, the billing records, which Mr. Carrington reproduced in spreadsheet form, show the rates billed by Sherman & Howard and Buchalter. I have no reason to doubt the representation that the rates and hours in the spreadsheet accurately repeated the information in the bills themselves.

number of years out of law school.  It would have generated higher rates than those charged in this case.

Stryker's retained expert, Mr. Lebsack, acknowledged that there are commercial litigators in Denver who charge rates in excess of $600 per hour, but he added that there are many competent, qualified, and experienced commercial litigators in Denver who charge hourly rates in the range of $450 for senior partners, $350 for junior partners, $250 for associates, and $150 for paralegals.  ECF No. 416-2 at 4-5.  Those numbers are in the ballpark of what the Richards Carrington lawyers charged in this case.

Mr. Lebsack also cited a 2017 Colorado Bar Association survey that found that the median hourly rate for all lawyers was $250; for partners in private firms $275; and for the 75th percentile $350.  Not only are those figures four to five years out of date, but they cover all types of lawyers, including insurance defense firms such as Mr. Lebsack's firm, where billing rates are typically (and substantially) lower.  *Id.* at 5.

Stryker also attached The 47th Annual Survey of Law Firm Economics published by The National Law Journal in 2019.  ECF No. 416-9.  It reported that rates charged by Colorado lawyers ranged from $260 to $580 depending upon years of legal experience (and based on a total of 54 participants in the survey).  *Id.* at 7.  If we look just at the rates of the Colorado participating lawyers with more than 10 years' experience, which fits most of the partner level lawyers in the present case, the range in 2019 was from $380 to $580.  The excerpts from the survey did not indicate the types of practices in which the participants engaged.  Even so, the rates charge by the plaintiffs' lawyers in this case, a complex and from ORP's perspective a "bet the company" type of case, compare reasonably well to that survey's numbers.

Having considered all of the information provided, as well as my own 50 years of experience as a trial lawyer and judge in this community, I find that the rates charged by plaintiff's legal team, including the reduced rates charged by the Richards Carrington law firm, were reasonable. We can all look at the hourly rates charged for litigation these days and wonder how anyone could charge that much for an hour of legal work. I have much the same reaction when I hear what retained expert witnesses charge. But the reality is that that is what it costs to engage in modern, complex civil litigation. Stryker knows that.

   3. Lodestar summary (through May 31, 2022.

   In sum, I have adjusted the hours as indicated above, and I have adjusted the Richards Carrington rates from their original fee application to the hourly rates listed in their fee agreement, i.e., Carrington and Mair, $435; Ballard and Moore $335;[5] Hudgens and Johnston $275; and Spicher $135. The rates of the other lawyers on the chart at ECF 407-1, at 1 (but excluding the Wilson Elser and Halpern May lawyers) remain as indicated there. The result is:

| Timekeeper | Law Firm | Hours | Hourly Rate | Fees |
|---|---|---|---|---|
| Robert Hinckley | Buchalter 1 | 7.2 | $575.00 | $4,140.00 |
| Sarah Andrzejczak | Buchalter | 81 | $380.00 | $30,780.00 |
| Benjamin W. Hudgens | Richards Carrington, LLC | 236.2 | $275.00 | $64,955.00 |
| Christopher P. Carrington | Richards Carrington, LLC | 937.5 | $435.00 | $407,812.50 |
| Dyanna Spicher (P) | Richards Carrington, LLC | 522.5 | $135.00 | $70,537.50 |
| Emma K. Johnston | Richards Carrington, LLC | 183.9 | $275.00 | $50,572.50 |
| Molly S. Ballard | Richards Carrington, LLC | 937 | $335.00 | $313,895.00 |
| Ruth Moore | Richards Carrington, LLC | 312.4 | $335.00 | $104,654.00 |
| Todd E. Mair | Richards Carrington, LLC | 148.3 | $435.00 | $64,510.50 |
| Adrian Leonard | Sherman & Howard | 264.9 | $380.00 | $100,662.00 |
| Dawn Leget | Sherman & Howard | 129.4 | $650.00 | $84,110.00 |
| Joanna Robarge (P) | Sherman & Howard | 74.4 | $235.00 | $17,484.00 |
| Nick DeWeese | Sherman & Howard | 584.3 | $575.00 | $335,972.50 |
| Peter Koclanes | Sherman & Howard 4 | 423.6 | $650.00 | $275,340.00 |
| Total | | 4,977.5 | | $1,925,425.50 |

---

[5] It was not clear whether Ms. Ballard was considered to be a senior or junior partner. However, in the state court case, and therefore in the spreadsheet on the sanction attorney's fees, she was billed at $335, the junior partner rate. ECF No.433-4.

B. **Lodestar – Post Trial (Fees Incurred After May 31, 2022).**

At the conclusion of the Court's Findings of Fact, Conclusions, and Order of Judgment issued on May 10, 2022 I directed counsel to confer and to attempt in good faith to resolve the matters of reasonable attorney's fees, costs, and prejudgment interest.  ECF No. 398 at 30. Agreement was not achieved.  Plaintiffs have incurred substantial fees in preparing and briefing those issues as well as the parties' motions to amend the original judgment.[6]  As indicated above, time entries through May 31, 2022 were included in plaintiffs' original fee application.  I address here the fees incurred beginning June 1, 2022.

Plaintiffs submitted that they incurred $30,928.50 in fees and costs between June 1 and June 15, 2022.  ECF No. 407 at 10.  The fees were calculated using plaintiffs' hypothetical market rates, not the actually billed rates.  In response Stryker repeated its objection to any award of attorney's fees.  *See* ECF No. 416.  In any event, the June 1-15, 2022 fees are subsumed in a later fee application and will not be counted twice.

On October 10, 2012 – two days before the hearing on fees, costs, and interest -- plaintiffs updated their post-May 31, 2022 attorney's fees through September 30, 2022, indicating 280.4 hours for $122,182 at plaintiffs' hypothetical market rates.  ECF No. 439 at 1-2. This included the $30,928.50 from the first post-trial submission.  The hours figure is supported by time entries in a chart, showing 292.6 hours total less 12.2 hours culled.  ECF No. 439-2.

---

[6] Stryker argues that fees for efforts to seek fees should be disallowed.  ECF No.450 at 9.  I disagree.  The parties could not agree on the amounts of fees, costs, and interest, so additional fees necessarily were incurred.  Stryker had a full opportunity to brief the issues and to be heard at the hearing.  An award of fees for time spent in preparing an attorney's fee motion is not contrary to New Jersey law.  *See Fagas v. Scott,* 597 A.2d 571, 590-91 (N.J Super. 1991).  The Tenth Circuit "generally allows recovery of fees for attorneys' work in seeking attorney's fees."  *Hernandez v George,* 793 F.2d 264, 269 (10th Cir. 1986).  It makes sense.  Otherwise, "uncompensated time spent on petitioning for a fee automatically diminishes the value of the fee eventually received."  *O Centro Espirita Beneficente Uniao Do Vegetal in U.S. v. Duke,* 343 F. Supp. 3d 1050, 1080 (D.N.M. 2018) (citations omitted).

Stryker did not have time to file a written response before the hearing, but I am aware of Stryker's position from the hearing and various filings before and after the hearing.

I have examined the time entries and removed an additional 11.2 hours.  I then applied Richards Carrington's rates per its fee agreement rather than its hypothetical rates.  The result is $78,520.50, calculated as follows:

| | | |
|---|---|---:|
| Carrington: 53 hours @ $435 = | | $23,055.00 |
| Ballard: 48.8 hours @ $335 = | | $16,348.00 |
| Hudgens: 30.5 hours @ $275 = | | $8,387.50 |
| Spicher: 71.1 hours @ $135 = | | $9,585.00 |
| Moore: 49.5 hours @ $335 | | $16,582.50 |
| Mair: 0.5 hours @ $435 = | | $217.50 |
| Reaven: 15.8 hours @ $275 = | | $4,345.50 |
| Total:  269.2 hours | | $78,520.50 |

On October 19, 2022 plaintiffs submitted additional post-trial hours for the period October 1 through October 12, 2022.  ECF Nos. 447 at 5-6 and 447-6.  The time entries totaled 145.8 hours but plaintiffs removed 29.1 of those hours.  I have reviewed the remaining hours and find no reason to remove additional hours.  Plaintiffs, using their hypothetical rates, provide a total of $48,642.00.  However, I have again used their actual rates billed per their fee agreement the result is a total of $34,942.50.

**C.  <u>Total Lodestar</u>.**

The lodestar is the sum of the fees through May 31, 2022 (1,925,425.50), plus the fees for June 1, 2022 through September 30, 2022 ($78,520.50), plus the fees for October 1 through October 12, 2022 ($34,942.50).  The total is $2,038,888.50.

**D.  <u>Johnson Factors</u>.**

Having calculated the lodestar, I then look at the twelve *Johnson* factors to determine whether an adjustment to the lodestar is appropriate.

1. <u>Time and Labor Required</u>.  I have discussed this issue at length in my determination of the reasonableness of the hours in determining the lodestar.  No further adjustment is appropriate for this factor.

2. <u>Novelty and Difficulty of the Questions</u>.  During the hearing Mr. Carrington described the non-solicitation issues as not particularly novel.  ECF No. 449 (transcript) at 22.  I do not entirely agree.  Plaintiffs were able to prove, through much effort, that Stryker wrongfully solicited ORP's former sales representatives.  The novelty was that the sales representatives had unique training and experience selling Stryker products and serving physicians with whom they developed relationships.  It was that training and experience that made it inevitable that the sales representatives would look to Stryker for employment once the contracts were terminated, which in turn resulted in the Court's finding that ORP had not proven damages from the solicitation.

The contract issues should have been straightforward.  However, plaintiffs had to disprove Stryker's multiple claims of cause for termination of the joint contract and counter Stryker's counterclaims that ORP breached both contracts.  In the Court's words during the hearing, "[i]t was a complex, difficult breach of contract case." *Id.* at 23.  On balance, this factor deserves some weight with respect to adjustment of the lodestar.

3. <u>The Skill Required</u>.  A primary reason for the finding of liability on the non-solicitation issue was the lack of credibility of the testimony of defense witnesses, including in particular Stryker's primary representative, Mr. Jacobs, and several of the former sales representatives.  Mr. Carrington demonstrated superior skill in his cross-examinations that undermined these witnesses' credibility.  Given that his firm's hourly rates were significantly lower than most of the other firms who participated in the case, including Stryker's legal team, this is a factor supporting an increase above the lodestar.

4. <u>Preclusion of Other Employment</u>.  The Richards Carrington firm is small in comparison to the other law firms involved in the case.  The tasks that the firm completed in a relatively short amount of time between retention and trial probably required nearly the full attention of Mr. Carrington and his colleagues who worked on the case.  Mr. Carrington stated during the hearing that the case "at up all our bandwidth at my firm and my team of litigators." *Id.* at 24.  However, their devotion to this client was also caused by their simultaneous representation of the plaintiffs in the state court case against the former sales representatives.  Moreover, while the two cases no doubt consumed the vast majority of the time of the team assigned to the cases, the firm does have other lawyers.  Mr. Carrington said, "there were plenty of cases that we had to turn down," but he also acknowledged that the cases were probably among the most interesting and lucrative cases the firm has had.  *Id.*  I do not consider this to be a significant factor in assessing the reasonableness of the attorney's fees.

5. <u>Customary Fee in the Community</u>.  I have discussed this issue at length.  The hourly rates charged by the plaintiffs' lawyers other than Richards Carrington were within the range of rates that have been charged by lawyers and law firms hired to prosecute or defendant high ticket, complex civil litigation in this community in the 2020-2022 time frame, including Stryker's lawyers.  The rates charged by the Richards Carrington firm were below or at least at the low end of the range.  In combination with the next factor, it supports an upward adjustment from the lodestar.

6. <u>Whether the Fee was Fixed or Contingent</u>.  The Richards Carrington firm was hired because plaintiffs were unable to keep up with the full-rate billings of Sherman & Howard, and because the smaller firm was willing to bill on a reduced rate plus contingency fee basis.  Plaintiffs suggested for purposes of their fee application to use a hypothetical rate derived from

the average of the rates charged by Sherman & Howard, Holland & Hart, and Seyfarth Shaw. Stryker objected to the Court's approving that and insisted that the rates actually charged should be used. I have agreed with Stryker and calculated the lodestar using the Richards Carrington's rates actually charged. But their fee agreement included the partial contingency fee to make up for their reduced rate schedule, and it is appropriate to consider that as a factor in making an adjustment to the lodestar for present purposes.

7. <u>Time Limitations Imposed by the Client</u>. No doubt plaintiffs wanted this case moved forward as quickly as possible. That is reflected, for example, in plaintiffs' motion to reconvene the trial following the Covid interruption sooner than the date originally chosen. ECF No. 342. However, the primary time pressure resulted from the relatively short period of time between retention of the Richards Carrington firm in the middle of the case and the trial, not limitations imposed by the plaintiffs. I do not consider this to be a factor in making any adjustment to the lodestar.

8. <u>The Amount Involved and Result Obtained</u>. This case was brought in the context that the parties came close to reaching an agreement shortly after the termination of the trauma contract that would have avoided this case and provided more money to the plaintiffs. The potential deal fell through for various reasons. At that point, litigation was inevitable, and at least from plaintiffs' perspective, it was either "bet the company" litigation or close to it. In that context, plaintiffs achieved an outstanding result, having proven breaches of the parties' two contracts with respect to restriction payments That success was achieved in large part due to the ability of plaintiffs' counsel, particularly in light of the extremely vigorous defense, the counterclaims, and the discovery conduct that result in sanctions.

There was discussion during the hearing as to whether plaintiff's failure to prove damages on the solicitation claim should cause the Court to deduct from the lodestar.  I do not agree.  Plaintiffs proved that Stryker violated the non-solicitation clause in the contracts, which was a central part of plaintiffs' case.  They did not prove entitlement to additional damages on the solicitation claim, but they still achieved overall a significant monetary result.  Stryker's conduct vis-à-vis its solicitation of the sales representatives created a context in which the Court viewed its allegations that it terminated the joint contract for cause (including its willingness to withdraw its position that the termination was for cause if plaintiffs let Stryker hire sales representative James Demorest), and that ORP breached both contracts.  On balance, I do not consider this factor to support an adjustment of the lodestar, either up or down.

9.  <u>The Experience, Reputation and Ability of the Attorneys</u>.  Mr. Carrington described the background and experience of the lawyers in his firm, the Buchalter firm, Sherman & Howard (as well as the Wilson Elser firm, the Halpern May firm, and Mr. O'Rourke) in his declaration, ECF No. 407-2.  As might be expected for these law firms and litigation of this nature, the lawyers have outstanding credentials; and the more senior lawyers have substantial relevant experience.  That is true of Stryker's legal team as well.  I consider these factors to be inherent in the rates that I have found to be reasonable, not a reason to adjust the lodestar.

10.  <u>The Undesirability of the Case</u>.  This is not a factor here.

11.  <u>The Nature of the Professional Relationship with the Client</u>.  It does not appear that plaintiffs have any prior relationship with these lawyers except Mr. O'Rourke and perhaps Halpern May.  This is not a relevant factor here.

12.  <u>Awards in Similar Cases</u>.  The Court is not aware of awards in similar cases that would be relevant to the attorney's fee in this case.

18

### E.  **Conclusion**.

I do not find cause in the *Johnson* factors to increase or decrease the lodestar with respect to the law firms other than Richards Carrington.  Based on *Johnson* factors 2, 3, 5 and 6, the Court finds it to be appropriate to increase the Richards Carrington component of the lodestar.  The contingency set forth in the fee agreement was complex, but I have noted, Mr. Carrington suggested that it probably amounted to about 15%.  I find that it is reasonable to increase the Richards Carrington portion of the lodestar by 15% in these circumstances.

The Richards Carrington portion of the lodestar is $1,190,400.  Adding 15% brings it to $1,368,960.  Adding that to the non-Richards Carrington portion of the lodestar ($848,488.50) produces an attorney's fee award of **$2,217,448.50**.

### III.  ATTORNEY'S FEES AS A SANCTION.

The Court imposed a sanction of 90% of the reasonable attorney's fees and costs plaintiffs incurred recovering text messages in the related state court litigation, the amount to be allocated three-quarters to Stryker and one quarter to the Seyfarth Shaw law firm.  ECF No. 420 at 29.  Plaintiffs claim that 90% of the fees incurred in the state case pursuing the text messages totals $103,461.35.  ECF No. 423 at 1.  This figure is comprised of $51,105 for work performed by Richards Carrington; $15,530.25 for 30% of the charges billed by Sherman & Howard in connection with a two-day discovery dispute hearing before Judge John Leopold, the special master in the state case; $43,831.81 for work performed by forensic vendor BIA Forensics related to the text messages; and $4,490 for 30% of the charges of the special master Judge Leopold related to the two-day hearing; times 0.90.  ECF No. 423 at 1-5 and exhibits.  I consider the components in turn.

A. **Richards Carrington Fees**.

Stryker argues (1) plaintiffs did not provide invoices documenting that these charges were billed or proof of payment; (2) even though Mr. Carrington discounted some hours, some of the time included was spent on items other than recovery of the text messages; and (3) the firm used hybrid rates rather than the actual rates billed to plaintiffs. ECF No. 433 at 2-4. Stryker concludes that the correct amount should be $14,370.2 instead of the requested $51,105. *See* ECF No. 433-4.

The Court finds the first and third objections to lack merit. The Richards Carrington fees were billed at the same reduced rates that were agreed to in the present case, not the hybrid/hypothetical rates. Proof that the client has actually paid these charges is not required for purposes of a fee award of a sanction.

While some of the time was for review of text messages, that does not mean that the time was not useful for discovery that there were other text messages and attachments that had not been produced. I also acknowledge that Richards Carrington has deleted some of the time on its spreadsheet. However, while I gave Richards Carrington full faith and credit for culling duplicative or otherwise inefficient time from its attorney's fees application, here the issue is not inefficiency. Numerous time entries were not explicit as to whether the time was relevant to obtaining the text messages. Before reviewing Stryker's proposed deletions, I went through the time entries myself and identified entries where I could not reasonably confirm that the time was for obtaining the text messages. I then compared my deletions to Stryker's. The bottom line is that I have eliminated the following additional time, not because it necessarily was not related, but because I could not confirm that it was related:

Carrington: .3 (5/14/21); 1.1 (9/10/21); .5 (9/13/21): Total: 1.9 x $435 = $826.60.

Ballard: .1 (5/6/21); .1 (5/13/21); .8 (7/8/21); .4 (7/9/21); .3 (8/31/21); .5 (9/9/21); .4 (9/13/21); .1 (10/12/21); .7 (11/1/21); 1.9 (11/3/21); .8 (11/24/21); 2.5 (11/28/21); 3.9 (2/9/22): Total: 12.5 x $335 = $4,187.50.

Hudgens: 1.0 (11/2/21); 2.5 (11/3/21); .8 (11/26/21); 1.1 (11/27/21); 3.1 (11/29/21); .1 (12/1/21); 1.0 (2/7/22); 2.0 (2/15/22): Total: 11.6 x $275 = $3,201.60;

Spicher: .1 (5/17/21); .2 (7/9/21); .2 (9/9/21); .5 (9/10/21); 3.2 (11/2/21); 1.0 (11/3/21); 3.4 (11/29/21); 1.0 (11/30/21); 3.1 (12/2/21): Total: 12.7 x 135 = $1,714.50.

In sum, the Court finds that Richards Carrington fees totaling $41,174.80 are properly included in determining the sanction.

### B. **Other Fees and Costs.**

Stryker claims that the Sherman & Howard, BIA, and Special Master portions of the requested sanction are excessive because plaintiffs did not reduce those charges sufficiently to eliminate work unrelated to the text messages issue. ECF No. 433 at 4-5. Stryker claims that the correct amounts are $5,176.75 Sherman & Howard; $28,012.73 BIA; and $3,940 Judge Leopold; TOTAL: $51,499.68. *Id.* at 5 and exhibits. Plaintiffs did not reply with respect to these numbers. *See* ECF No. 437. Plaintiffs' estimated percentages are arbitrary. I have also considered the Declaration of Brett C. Painter of Davis, Graham & Stubbs, counsel for the sales representatives in the state court litigation. ECF No. 433-3. I elect to accept Stryker's numbers for the Sherman & Howard, BIA, and Judge Leopold components of the fees and costs to be considered in determining the sanction. The total is $37,129.48.

### C.  Conclusion.

The total for the sanction is $78,304.28 x .90 = **$70,473.85**.  It will be allocated 75% to Stryker and 25% to Seyfarth Shaw.

## IV.  COSTS.

### A.  Costs Requested.

Plaintiffs initially sought an award of $186,271.41 in "reasonable expenses."  After the hearing they submitted a revised cost application in the amount of $183,271.25.  The breakdown is as follows:

| | |
|---|---|
| Attorney Consulting | $13,700.00 |
| Copying | $6,364.32 |
| Expert Fees | $39,636.00 |
| Filing Fees | $333.81 |
| Meals | $424.94 |
| Mediation | $984.00 |
| PACER | $682.90 |
| Process Server Fees | $4,466.40 |
| Records (AT&T) | $70.00 |
| Relativity | $10,293.69 |
| Research | $19,031.58 |
| Special Master | $17,355.00 |
| TLO | $125.00 |
| Transcripts | $36.987/15 |
| Trial – Demonstratives | $21,991.52 |
| Trial - Hot Seat | $10,693.09 |
| Witness Fees | $181.07 |
| **TOTAL** | **$183,721.41** |

Declaration of Dyanna Spicher, ECF No. 447-1 at 2.

### B.  Stryker's Objections.

In response Stryker made two general objections and numerous objections to the individual cost categories.  As a general objection, Stryker argued that only costs enumerated at 28 U.S.C. § 1920 may be awarded.  *See* ECF No. 416 at 10.  If this were an award of costs to the

prevailing party under § 1920 and Fed. R. Civ. P. § 54(d)(1) I would agree.  However, the Court

has interpreted the two contracts as providing for an award of attorney's fees and "reasonable

expenses."  The federal costs statute does not apply to an award of costs pursuant to the

contracts.  *See Alison v. Bank One-Denver,* 289 F.3d 1223, 1246 (10th Cir. 2002) (a contract's

"'expenses reasonably incurred' language requires an award beyond those 'costs' listed in §

1920").  Stryker nevertheless repeats its objection to each expense item that does not fit within

what is allowed by 28 U.S.C. § 1920.  It presumably is doing so to preserve its record.  I

acknowledge that "continuing objection" and will not repeat it again and again as I go through

plaintiffs' expenses categories in this order.

Second, Stryker argues as a general matter that costs cannot be awarded if backup is not

provided, citing  *Perri v. Resorts International Hotel, Inc.,* No. 10-4489 (AMD), 2014 WL

201520, at *3 (D. N.J. Jan. 16, 2014) (costs must be substantiated by invoices).  *Perri* involved

an award of costs under 28 U.S.C. § 1920.  Regardless, the requirement of backup for the

claimed expenses is reasonable, and I agree with Stryker on this point.

Third, Stryker has provided a chart summarizing its specific objections to plaintiff's

application for an award of reasonable expenses on a category by category basis.  ECF No. 416-7

at 13-17.  I will go through each category in turn.

Attorney Consulting ($13,700).  Disallowed.  Mr. Carrington consulted with another

Denver attorney, Larry S. Pozner.  The backup has been provided.  ECF No. 407-5.  From the

time entries I infer that the consultation, at $500 per hour, concerned overall strategy, discovery,

and sanction issues.  The hourly rate is reasonable for an attorney of Mr. Pozner's experience and

reputation.  However, I have already addressed attorney's fees in the attorney's fee and the

sanction sessions.  There were multiple lawyers at Richards Carrington, Wilson Elser, and later

Buchalter available for consultation.  Mr. Carrington chose to seek additional advice from Mr. Pozner, but I decline to pass Mr. Pozner's charges on to Stryker.

Copying, Sherman & Howard ($3,869.12).  Allowed.  The expense is documented at ECF No. 447-7.  Some law firms charge for copying, and others do not.  Richards Carrington did not, but Sherman & Howard did.  It is a charge that plaintiffs paid or are obligated to pay.

Copying costs at Wilson Elser ($2,497.80): Disallowed.  I disallow this expense for the same reason that I disallowed Wilson Elser attorney's fees.  However, Mr. Carrington has indicated that $25,975.90 of the $183,721.41 in its chart was paid by CNA, which hired Wilson Elser to defend the counterclaims.  *See* ECF No.; 447-1 at 2.  To avoid double counting, I will simply deduct the $25,975.90 from the total and ignore these small amounts which presumably are part of that figure.

Expert fees of Elaine White ($39,636.94).  Disallowed.  I agree with Stryker, though not because expert witness fees are not ordinarily recoverable as Stryker argues.  *See* ECF No. 416-7 at 3.  Ms. White's work was primarily an effort to put dollar amounts on plaintiffs' theories of damages caused by Stryker's solicitation of the ORP sales representatives.  The Court found that plaintiffs did not prove that they suffered damages as a result of the wrongful solicitation, and it therefore awarded only nominal damages of $1.00 on that claim.  I do not find that it would be reasonable to require Stryker to pay the expert's fees in this context.[7]

---

[7] I do not, however, agree with Stryker's argument during the hearing, ECF No. 449 at 82, and in its Response to Plaintiffs' Second Supplement, ECF No. 450 at 6-7, that attorney's fees for time the lawyers spent with Ms. White should be identified and disallowed.  It was appropriate for plaintiffs' counsel to seek, find, hire, and meet with a damages expert.  She did calculate the amount of the restriction payments, though that was a relatively smaller part of her work.  That the Court ultimately did not find that the solicitation caused monetary damages is not to say that the attorney's time spent with the expert was unnecessary or unreasonable.  The logic of Stryker's argument is that plaintiffs or the Court should identify every tenth of an hour that was spent on a claim or issue or witness or document that ultimately did not figure in the result of the case.  That is not practical, reasonable, or equitable.

FedEx expense, Richards Carrington ($291.24).  Disallowed.  This is a relatively small matter, but after considerable searching, I was not able to find invoices supporting this amount in the exhibits to ECF No. 407 or the exhibits to ECF No. 447.

FedEx expense, Sherman & Howard ($42.57).  Allowed.  The documentation was provided.  ECF No. 447-11 at 3.  It is a minor but routine type of litigation expense.

Filing Fee ($400).  Allowed.  Conceded by Stryker.

Meals ($424.94).  Disallowed.  Plaintiffs provided the documentation.  ECF No. 447-9.  Some or all of it was for Wilson Elser attorneys.  More importantly, however, the Court's view is that at the rates these firms are charging, the lawyers can afford to buy their own meals without adding that to their clients' (or, at least, to Stryker's) bill.

Mediation ($984).  Allowed.  The documentation was provided.  ECF No. 407-8.  It is remarkable and, in my view, unfortunate that, relative to the amounts at stake, so little was spent on professional mediation services.

PACER, Richards Carrington ($486.90).  Disallowed.  Stryker argues that PACER is free to counsel in this case, and that plaintiffs failed to document the expense or explain why the cost was reasonable and necessary.  The documentation has been provided.  ECF No. 447-10 at 1-26.  So far as I have been able to determine, the explanation has not.

PACER, Sherman & Howard ($166.30).  Disallowed.

PACER, Wilson Elser ($183.50).  Disallowed but included in the $25,975.90 deduction.

Process Server Fee, Richards Carrington ($3,189.00).  Allowed.  The documentation has been provided.  ECF No. 407-9 and 447-11.

Process Server Fee, Buchalter ($323.42).  Allowed.  The documentation has been provided.  ECF No. 447-11 at 3.

Process Server Fee, Wilson Elser ($953.98). Disallowed but included in the $25,975.90 deduction.

Records ($70.00). Allowed. Stryker questions how this minor cost differs from other process server costs. The documentation indicates that ORP was charged one billed unit ($25) and a processing fee ($45). ECF No. 407-10. The Court accepts the representation that this expense was reasonable and necessary.

Relativity ($10,293.69). Allowed. This is for use of document management software. The documentation has been provided. ECF No. 447-12.

Research, Richards Carrington ($4,134.84). Allowed. Stryker states that plaintiffs have failed to indicate what was researched, when it was researched, why it was researched, or how the charges were reasonable. As its own lawyers know, computerized research of the law via LexisNexis or Westlaw is commonly used by most lawyers and is considerably more efficient that the type of book-based research that was what was available when I started practicing law in 1972. I would not expect counsel to explain to opposing counsel precisely what they were researching, as that undoubtedly gets into attorney work product issues. The documentation has been provided. ECF No. 447-13.

Research, Sherman & Howard ($14,896.74). Allowed. This is allowed for the same reason as the charges incurred by Richards Carrington for computerized research.

Special Master ($17,355). Allowed. Stryker states that the Court already awarded these expenses a sanction. That was true in the Court's original Findings, Conclusions, and Order of Judgment. However, the Court replaced the Special Master fees with a different sanction in its amended order on grounds that they are already recoverable by plaintiffs as part of their reasonable expenses. I also note that the Court has discretion to allocate a special master's

compensation on a basis other than is provided in the appointing order after giving notice and an opportunity to be heard, which has occurred. Fed. R. Civ. P. 53(g)(1). The Court is required to allocate a special master's compensation between the parties in consideration of "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(g)(3). Those factors warrant assigning this expense to the defendant in this case.

TLO ($125.00). Disallowed. This is a minor expense, but the documentation provided was meaningless to me. *See* ECF No. 447-14.

Transcripts ($36,987.15). Disallow $4,366.90. Stryker conceded that $14,080.90 of this amount is allowable. ECF No. 416-7 at 17. According to the Stryker's chart, *id.* at 13-17, Stryker disputes $14,615.79, comprised of $32.55 for a court reporter's transcript of a telephonic discovery dispute; a $1,297.20 portion of the Morgan Schilling deposition expense that Stryker attributes to "convenience of counsel" (meaning such things as digital copies, exhibits with tabs, color copies of exhibits); $228.89 of the deposition of Joe Jaster, convenience of counsel; $200.00 for a transcript of a statement by Lee Petrides, no indication what it was for; $1,005.20 of the Lee Petrides deposition, convenience of counsel; $349.20 of the video of the Petrides deposition, convenience of counsel; $31.30 of the Amy Shackelford deposition, convenience of counsel; $ 75.00 of the Elaine White deposition, convenience of counsel; $29.60 of the Paul Hoelscher deposition, convenience of counsel; $167.30 of the Adam Jacobs deposition, convenience of counsel; the entire $4,114.50 charge for synchronized videos of the Shackelford, Jacobs, Hoelscher, and Bonessi videos, convenience of counsel; $33.80 of the Michael Bonessi deposition, convenience of counsel; the entire $671.90 charge for the deposition of Dr. Alejandro Miranda, a witness not used at trial; $2,742.60 for Realtime transcripts by the court reporter,

convenience of counsel; and $1,591.80 for a Realtime transcript, convenience of counsel.  The charges to which they object add up to $12,570.84.  Adding the conceded charges ($14,080.90) to the disputed charges ($12,570.84), the total is $26,651.74.  Since plaintiffs seek $36,987.15 in this category, there is a discrepancy of $10,335.41.  I cannot explain it.  I can only consider the objections that Stryker actually made.

Stryker cites *Romero v. CSX Transportation, Inc.,* 270 F.R.D. 199 (D.N.J. 2010) for the proposition that "costs associated with depositions merely for investigatory or discovery purposes, which merely provide useful background information but are not necessarily used for use in [sic] prosecution of a party's claims, are not taxable or recoverable."  *Romero* concerned an award of costs under Fed. R. Civ. P. 54(d)(1) and that district's local rule 54.1, not an award of "reasonable expenses" as provided by contract.  Stryker also cites *New Jersey Mfrs. Ins. Grp. V. Electrolux, Inc.,* No. 10-1597, 2013 WL 5817161, at *8  (D. N..J. Oct. 21, 2013) and *Druding v. Care Alternatives,* No. 1:08-cv-2126-NLH-AMD, 2019 WL 5957403 (D. N.J. Nov. 13, 2019) to show the limits of deposition-related expenses that have been awarded by federal judges in New Jersey under § 1920.  These cases are the support for their "convenience of counsel" objection.  But again, § 1920 does not govern this Court's award of "reasonable expenses" in this case.

I agree that a transcript of a telephone discovery hearing, though perhaps useful to assist counsel in recalling the Court's rulings, is not a necessary expense in the prosecution of the case. Further, although undoubtedly an expense that was incurred, I find that the cost of Realtime transcripts should not be transferred to Stryker when there were multiple lawyers and staff present to take notes and share recollections of the trial proceedings.  That is not to say that the reporter's Realtime charges were in any way excessive.  It is difficult work, and if the lawyers

want Realtime, they must pay the price.  But I am discussing which expenses are "reasonable expenses" to charge Stryker, and in the context of this case, I elect not to include them. Accordingly, I will exclude $4,366.90 in this category.

Trial – Demonstratives ($21,991.52).  Allowed.  Stryker states that the documentation for this item is for exemplification , and that $250 per hour exceeds reasonable exemplification costs.  In fact, this category is not for "exemplification" as I understand that term.  Rather, it is for consultation and preparation of demonstrative exhibits.  Demonstrative evidence is commonly used in hearings and trials and can be among the most effective type of evidence.  If a law firm does not have in-house graphics and computer specialists, it typically has to obtain the demonstratives from a business that provides the service.  That is the case here, and the business charged $250 per hour for its services.  I have no reason to question the reasonableness of what the business charged.  Documentation for the amount requested is found at ECF No. 407-13.

Trial – Hot Seat ($10.693.09).  Allowed.  This expense was incurred with Visual Advantage, a business that assists counsel in managing the presentation of evidence at trial.  It is common in modern trials to have someone on the trial team who is adept at displaying exhibits electronically.  Stryker states that such services are typically performed by paralegals or support staff employed at a law firm.  ECF No. 416-7 at 12.  That might be true of large firms such as those which represented Stryker (I don't know what expense, if any, Stryker incurred for the service, as the information is not available to me).  In this case, Richards Carrington hired an outside vendor to provide the service.  The documentation has been provided at ECF No. 447-`4.

Witness Fees ($181.07).  Disallowed.  This is a minor expense, but I could not find documentation of it.

C. **Summary – Reasonable Expenses.**

Excluding the three small Wilson Elser expenses to which Stryker objected, the Court has

disallowed claimed expenses totaling $59,379/29.  Subtracting that amount from the requested

$183,721.41 leaves $124,342.12.  Then I deduct the $25,975.90 paid by CNA, leaving a net total

of reasonable expenses to be awarded of **$98,366.22**.

## V.  PREJUDGMENT INTEREST.

The Amended Judgment awarded plaintiffs prejudgment interest to be determined later

on both the joint  and the trauma contracts.  ECF No. 422 at 2.  In a diversity action prejudgment

interest is determined by state law, and post-judgment interest is determined by federal law—

specifically, by 28 U.S.C. § 1961.  *See Youngs v. American Nutrition, Inc.*, 537 F.3d 1135, 1146

(10th Cir. 2008); *see also Advanced Optics Elect., Inc. v. Robins*, 769 F. Supp 2d 1285, 1306 (D.

N.M. 2010) ("In a diversity action, post-judgment interest is calculated in accord with the

formula set out in 28 U.S.C. § 1961(a)," while "the prejudgment interest rate is set by state

law.").

Courts apply the choice-of-laws rules of the forum state because those rules are

substantive law.  *See Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th

Cir. 2009).  Colorado's choice-of-law rules generally require applying the law that contracting

parties selected to govern their relations "unless there is no reasonable basis for their choice or

unless applying the law of the state so chosen would be contrary to the fundamental policy of a

state whose law would otherwise govern."  *Brown v. Fryer*, 2013 WL 1191405 at *2 (D. Colo.

Mar. 22, 2013) (citing *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994)).

Here, the contracts specify that they will be governed by New Jersey law.  In New Jersey "the primary consideration in awarding prejudgment interest is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled." *Litton Industries, Inc. v. IMO Industries, Inc.,* 982 A. 2d 420, 430-32 (N.J. 2009).

The parties dispute (1) the accrual date, i.e., the date on which prejudgment interest begins to run; (2) the prejudgment interest rate; and (3) whether prejudgment interest should be simple or compound; and (3).  I consider their positions in turn.

**A.  <u>Date of Accrual</u>.**

On March 27, 2019 Adam Jacobs on behalf of Stryker informed Mr. Petrides that Stryker was terminating the joint contract for cause.  Amended Findings of Fact, Conclusions of Law, and Order of Judgment, ECF No. 429, at 3.  The Court found that the termination was a breach of the contract.  *Id.* at 10.  Under § 16.3 of the joint contract, Plaintiffs' Ex. 4, ORP was entitled to restriction payments.   The Court determined the amount to be $1,018,896.  *Id.* at 20.  The restriction payments were due in 12 equal month installments in March 2019.  *Id.*  No installment was paid.

Mr. Petrides terminated the trauma contract effective May 4, 2020.  *Id.* at 4.  The Court found that ORP did not breach the contract, and therefore, it was entitled to restriction payments under § 16.3 of the trauma contract, Plaintiffs' Ex. 5.  *Id.* at 10-11.  The Court determined the amount to be $3,731,791.47.  *Id.* at 20-21.  The restriction payment were due in 12 equal monthly installments beginning on June 4, 2020.[8]  May 3, 2020.  No installment was paid.

---

[8] In the Amended Findings of Fact, Conclusion of Law, and Order of Judgment I found that restriction payment under the trauma contract were to begin on May 3, 3030.  ECF No. 429 at 21.  In their Motion

Plaintiffs argue that Stryker anticipatorily repudiated its obligation to make the restriction payments on March 27, 2019 (when it terminated the joint contract for asserted cause) and June 4, 2020 (when it failed to make the first restriction payment under the trauma contract), thereby immediately entitling plaintiffs to claim damages for total breach. *See Spring Creek Holding Co., Inc. v. Shinnihon U.S.A., Ltd,* 943 A.2d 881, 893-94 (N.J. App. Div. 2008). Thus, the accrual dates for the calculation of prejudgment interest would be March 27, 2019 for the joint contract and June 4, 2020 for the trauma contract.

Stryker did not address the anticipatory repudiation argument as such in its response. However, it implicitly did so by tendering a complex schedule of interest payments with each one-twelfth payment having its own interest calculation carrying forward all the way to the date of judgment, May 20, 2022. ECF Nos. 416 at 10 and 416-6. In their reply, plaintiffs asserted, without further argument, that the accrual dates should be March 29, 2019 [sic] and June 4, 2020.

During the hearing I stated that I did not agree with plaintiffs' anticipatory repudiation argument. ECF No. 449 at 39. However, on reflection, the argument makes sense. Stryker clearly indicated that it would not make any restriction payment under either contract. By doing so, it repudiated the contract including the payment schedule. Moreover, because New Jersey law makes the determination of prejudgment interest in a contract case a matter of equity, I find that determining that Stryker anticipatorily repudiated the contracts on March 27, 2019 and June 4, 2020 respectively is equitable. Accordingly, the total restriction payments for the two contracts became due and prejudgment interest began to run on those dates.

---

re: Attorney's Fees, Costs, and Prejudgment Interest, ECF No. 407, plaintiffs indicated that the first payment was due on June 4, 2020. ECF No. 407 at 10. I accept that correction.

### B. **Prejudgment Interest Rate**.

"Under New Jersey law, a trial judge in a contract action has discretion to award prejudgment interest in accordance with equitable principles." *Gleason v. Norwest Mortg., Inc.,* 253 F. App'x 198, 204 (3rd Cir. 2007) (unpublished). While this unpublished decision is not binding, I do not quarrel with the general proposition.

Plaintiff argues that it would be equitable to apply Colorado's statutory prejudgment interest rate of 8% due to "the severity of Stryker's intentional breaches of contract." ECF No. 407 at 9 (citing Colo. Rev. Stat. § 5-12-102(1)(b)). I am not convinced. Colorado law does not apply. Moreover, 8% per annum, which would be compounded annually under the Colorado statute, appears to be well in excess of a reasonable market rate during the period in question. Prejudgment interest is compensatory, not punitive. Plaintiffs did not show that plaintiffs likely would have earned eight percent had they had the money to invest. Indeed, it was indicated during the hearing that ORP borrowed money during the period at a cost of approximately 1.25 to 1.5 percent. ECF No. 449 at 25.

New Jersey does not have a statute that sets the rate for prejudgment interest. But "[t]he New Jersey Appellate Division has found that in contract cases, New Jersey Court Rule 4:42-11(a)(ii) – requiring application of the New Jersey Cash Management Fund Rate for pre- and postjudgment interest in tort actions – provides an appropriate 'starting point,' absent unusual circumstances." *W.R. Huff Asset Management Co., L.L.C. v. William Soroka 1989 Trust,* No. 04-3093, 2009 WL 2436692, at *7 (D. N.J. Aug. 6, 2009) (citing *DialAmerica Marketing, Inc. v. KeySpan Energy Corp.,* 865 A.2d 718, 733 (N.J. App. Div. 2005)).

Stryker points to the same New Jersey rule.  Def.  Hearing Ex. N.  As applicable here, the rates for the New Jersey Cash Management Fund were 1.5% (2019); 2.5% (2020); 1.5% (2021); and 0.25% (2022).  *Id.*  But the rule also provides that where the judgment in a tort action exceeds $15,000, two percent should be added to those interest rates.  *Id.*

In their reply, plaintiffs again argue that the Court should use Colorado's statutory rate of 8% compounded annually, essentially because "Stryker's strategic breaches of the [contracts] and willful withholding of restriction payments would have put ORP – a Colorado company – out of business had it not been for multiple loans ORP was forced to obtain."  ECF No. 418 at 8.  The conclusion does not follow from the premise.

I find that the tort rate in effect in New Jersey at the date of the breach, plus two percent as provided for judgments exceeding $15,000, is equitable in this case.  The yield of the Cash Management Fund and plaintiffs' own experience tend to show that these rates equitably compensate plaintiffs for the loss of use of the funds during the prejudgment period.  Thus, I agree with Stryker on the applicable interest rate but with one exception.  In Stryker's complex chart of prejudgment interest, ECF No. 416-6, Stryker has the interest rate changing from year to year.  This makes little sense to me.  By way of comparison, the federal post-judgment interest rate is "the rate equal to the week average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961.  The post-judgment rate in this case is fixed in perpetuity at the rate determined for the week preceding May 10, 2022.  If one applied Stryker's approach to post-judgment interest, the rate would potentially change weekly.  I find that Stryker's approach to be unnecessary and impractical.

The Court concludes that the equitable and applicable prejudgment interest rates for this case are the rates that were in effect under the New Jersey Cash Management Fund schedule as at the dates of the anticipatory repudiations of the two contracts, namely, 3.5% for the joint contract and 4.5% for the trauma contract.

### C. Simple or Compound.

Stryker cites New Jersey cases holding that, absent unusual circumstances, an award of prejudgment interest bears simple interest. *Promotion in Motion, Inc. v. Beech-Nut Nutrition Corp.,* No. 09-1228, 2012 WL 5045135, at *3 (D. N.J. Oct. 17, 2012); *Huff,* 2009 WL 2436692, at *10. The *Huff* court noted that "New Jersey courts have found that compound interest '"unduly hastens the accumulation of debt' and regard it as unfairly 'harsh and oppressive.'" *Id.*

However, both cases also recognize that courts have discretion to award compound interest. *Id.* Indeed, New Jersey courts have done so. For example, in *Buck Consultants, Inc. v. Glenpointe Associates,* No. 03-454 (Jll), 2010 WL 2104982 (D. N.J. May 25, 2010), albeit an unpublished letter opinion and order, the Court elected to exercise its discretion to apply compound interest "because it is reasonable to assume that a sophisticated business entity . . . would have deposited the withheld funds in a financial vehicle that earned compound interest."). *Id.* at *3

In this case I find that compound interest is equitable. This was a case between sophisticated businesses. Moreover, Stryker is a much larger company. At one point Stryker was willing to pay $13 million to erase the restriction payments, acquire ORP's sales force, and limited ORP's ability to compete for a period of time. ORP did not accept the proposal. So, Stryker ends up owing the restriction payments but obtaining the services of ORP's former sales force without additional payment to ORP and eroding ORP's ability to compete, all for a cost far

less than $13 million.  The impact of the deprivation of funds caused plaintiffs to have to change counsel midstream and borrow funds to pay new counsel at reduced rates.

Moreover, I have agreed with Stryker's argument that the New Jersey Cash Management Fund rates for tort cases will apply, even though the New Jersey courts called those rates a starting point.  The debt has not existed long enough that compounding interest is likely to be unfairly harsh and oppressive to a company the size of Stryker.  To the extent that the case has dragged on, Stryker's "scorched earth" approach shoulders much of the blame.  Compounding interest is not unusual in commercial settings.  Indeed, post-judgment interest that is governed by federal law is compounded annually.  I am satisfied that it is equitable in this case, and I exercise my discretion accordingly.

### D.  Prejudgment Interest Calculation.

1. Joint Contract.

| | | |
|---|---|---|
| 3/28/19 to 3/27/20 | $1,018,896 x .035 = | $35,661.36 |
| 3/28/20 to 3/27/21 | $1,054,557 x .035 = | $36,909.51 |
| 3/28/21 to 3/27/22 | $1,091,466.87 x .035 = | $38,201.34 |
| 3/28/22 to 5/10/22 | $1,129,668.21 x .035 x 44/365 = | $4,766.27 |
| | | |
| Total: | | $115,538.48 |

2. Trauma Contract

| | | |
|---|---|---|
| 6/5/20 to 6/4/21 | $3,731,791.47 x .045 = | $167,930.62 |
| 6/5/21 to 5/10/22 | $3,899,722.09 x .045 x 339/365 = | $162,987.02 |
| | | |
| Total: | | $330,917.64 |

3. Total Prejudgment Interest.

$115,538.48
$330,917.64
**$446,456.12**

## VI.  ORDER

An Amended Judgment will issue, consistent with the findings and conclusions set forth in this order.

DATED this 14th day of November, 2022.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge